■ STATE OF NEW YORK, Respondent, v INDUSTRIAL SITE SERVICES, INC., et al., Appellants. [862 NYS2d 118]—

Spain, J.P. Appeal from an order and judgment of the Supreme Court (Teresi, J.), entered October 23, 2007 in Albany County, upon a decision of the court in favor of plaintiff.

In May 1998, plaintiff's Office of General Services (hereinafter OGS) entered into a contract with defendant Industrial Site Services, Inc. (hereinafter ISS)—the lowest bidder—for the removal and environmental remediation of underground petroleum storage tanks located on state property in several counties in western New York. ISS's original bid included a $500,000 lump sum fee to cover the cost of securing necessary performance, labor and material bonds. OGS objected to the fee as excessive, and negotiations on that issue ensued between OGS and defendant Bhavesh Kamdar, president of ISS. Kamdar insisted that, in addition to reimbursement of premiums paid to the surety company for the necessary bonds, the contract include a provision to reimburse ISS for a guarantee fee which ISS agreed to pay to him and his wife in recognition of the cost to them incurred by providing the security demanded by the surety as a condition of issuing the bonds. Eventually, the parties agreed upon a formula—proposed by OGS as a function of the contract price—to reimburse ISS for the guarantee fee. The formula provided that $87.50 for every thousand dollars of contract value would be paid out over the course of the contract by adding a supplement of 9.52% to each bill paid to ISS. Based on the original agreed-upon contract amount, application of the formula resulted in up to $402,000 in guarantee fees to be paid on top

of the contract amount, resulting in a total contract price of $4,626,630.

It was understood when the contract was executed, however, that the amount of tank remediation that would be necessary was only an estimate. Indeed, after ISS began work under the contract, the need for additional tank remediation work performed under the contract led to change orders which increased the total value of the contract to $12.9 million, and ISS continued to charge OGS for the guarantee fee on the moneys due under the contract in excess of the original contract amount. In October 2000, after ISS had received $1,114,626 in guarantee costs—$712,626 over the $402,000 due as a function of the original contract amount—OGS requested that ISS reimburse the guarantee fees paid over the $402,000 "cap." Defendants refused, claiming that ISS was entitled to the additional guarantee fee based on the increased contract amount.[1]

Plaintiff commenced the instant action in August 2004, alleging fraud, misappropriation of public property, unjust enrichment and breach of contract. Upon completion of discovery, defendants moved for summary judgment. Supreme Court (McNamara, J.) denied the motion and a nonjury trial ensued (Teresi, J.). In October 2007, the court granted judgment in favor of plaintiff in the amount of $1,114,626 plus costs and interest. Defendants now appeal.

Initially, we agree with Supreme Court's denial of summary judgment to defendants on their breach of contract cause of action because a question of fact existed as to whether the contract contains a cap on the guarantee fee to be paid (*see Zuckerman v*

---

1. In March 2001, the Office of the State Inspector General referred the matter to the United States Attorney's office for the Western District of New York (hereinafter USAO) for investigation. The USAO determined that, although Kamdar had never been required to post any personal assets as collateral for the bond, he billed and ultimately received $1,114,626 in fraudulent guarantee costs from OGS. During the federal investigation, Kamdar fled the United States with his spouse and son and returned to India. Shortly thereafter, Kamdar's brother-in-law sold Kamdar's home located in the Town of Clarence, Erie County, for more than $352,229. In April 2003, the USAO commenced a forfeiture action for the proceeds of the home sale. Thereafter, the USAO and Kamdar executed a stipulation for resolution which provided that, in the event that Kamdar failed to appear within 180 days from the date that criminal charges were brought against him, a forfeiture order would result. A federal grand jury indicted Kamdar in June 2004 for various counts of mail fraud and money laundering in relation to his dealings with OGS. Despite attempts to reach a plea agreement, Kamdar failed to contact the USAO or appear before District Court to respond to the criminal charges leveled against him and, thereafter, in January 2005, an order of forfeiture was entered.

*City of New York*, 49 NY2d 557, 562 [1980]; *Dobco, Inc. v Facilities Dev. Corp.*, 263 AD2d 592, 593 [1999]). The guarantee cost provision, which immediately follows the unit price schedule total, simply states:

> "Guarantee Cost $\dfrac{\$87.50}{1,000} \times$ Contract Amt. = $\underline{\$402,000}$
>
> Note: To be paid as supplement to unit price earned as 9.52%."

The stated total of $402,000 could be construed as a maximum limit on the payment of such guarantee costs to defendants. However, the fee is clearly set forth as a function of the "contract amount" and the contract does not expressly state whether the guarantee cost will continue to be paid if the contemplated "contract amount" were to be increased, as happened here, by subsequent change orders.[2] Thus, we find the contract to be ambiguous with respect to the issue of a cap on the guarantee fee and, thus, subject to interpretation through parol evidence of the parties' intent (*see Stevens & Thompson Paper Co., Inc. v Niagara Mohawk Power Corp.*, 49 AD3d 1011, 1013 [2008]; *Spiak v Zeglen*, 255 AD2d 754, 757 [1998]). Given the conflicting evidence on whether a cap was intended by the parties, we conclude that Supreme Court properly denied defendants' summary judgment on this issue (*see Encarnacion v State of New York*, 49 AD3d 1038, 1039 [2008]).

Defendants' motion for summary judgment on the fraud cause of action was also properly denied. Defendants rely on the general indemnity agreement between ISS and its commercial surety company, which clearly states that the surety required only the personal indemnity of Kamdar and his wife; thus, defendants argue, plaintiff could not have justifiably relied on any material representation to the contrary. We find that sufficient evidence was submitted in opposition to support plaintiff's contention that Kamdar affirmatively represented that he and his wife suffered actual costs associated with providing personal collateral demanded by the surety to bond the project. Whether plaintiff's reliance on such statements was reasonable in light of the conflicting evidence posited by the general indemnity agreement, and the validity of defendants' assertions that these statements reflected a misunderstanding by Kamdar, rather than any intentional misrepresentations, presented factual questions that could not be resolved as a matter of law (*see Reiser, Inc. v Roberts Real Estate*, 292 AD2d 726, 728 [2002];

---

2. The change orders make no mention of the guarantee fee.

*American Honda Fin. Corp. v Progressive Cas. Ins. Co.*, 290 AD2d 850, 852 [2002]; *cf. Torrington Indus., Inc. v Southworth-Milton, Inc.*, 17 AD3d 894, 895-896 [2005]).

Turning to the trial evidence, however, we conclude—on the record before us—that plaintiff failed to prove any basis for liability against defendants. Although in a nonjury trial such as this we will accord considerable deference to the factual findings made by the trial court where "such findings are based largely upon credibility determinations" (*Martin v State of New York*, 39 AD3d 905, 907 [2007], *lv denied* 9 NY3d 804 [2007]; *see Tatta v State of New York*, 20 AD3d 825, 826 [2005], *lv denied* 5 NY3d 716 [2005]), much of the evidence relied upon by the parties herein consists of documentary and other nontestimonial evidence (*see Wolf v Holyoke Mut. Ins. Co.*, 3 AD3d 660, 660 [2004] [deference is not warranted where determination was made upon submitted affidavits]). Further, where we find that a conclusion different from that of the nonjury factfinder would not have been unreasonable, we "weigh the probative force of the conflicting evidence and the relative strength of conflicting inferences that may be drawn therefrom, and then grant the judgment which upon the evidence should have been granted by the trial court" (*Kandrach v State of New York*, 188 AD2d 910, 912-913 [1992]; *see Martin v State of New York*, 39 AD3d at 907; *Schieren v State of New York*, 281 AD2d 828, 830 [2001]; *State of New York v Massapequa Auto Salvage*, 267 AD2d 679, 680-681 [1999], *lv denied* 95 NY2d 753 [2000]).

Turning first to plaintiff's fraud claim, we find it unsupported by this record. "A party alleging fraud in the inducement bears the burden of proving the elements thereof 'by clear and convincing evidence' " (*Callahan v Miller*, 194 AD2d 904, 905 [1993], quoting *Chopp v Welbourne & Purdy Agency*, 135 AD2d 958, 959 [1987]; *see Gaidon v Guardian Life Ins. Co. of Am.*, 94 NY2d 330, 349-350 [1999]; *Tanzman v La Pietra*, 8 AD3d 706, 707 [2004]; *Mix v Neff*, 99 AD2d 180, 183 [1984]). The elements of fraud require plaintiff to demonstrate that defendants knowingly misrepresented a material fact with the intent to deceive plaintiff and, after having justifiably relied upon such misrepresentation, plaintiff experienced pecuniary loss (*see Young v Williams*, 47 AD3d 1084, 1086 [2008]; *Mann v Rusk*, 14 AD3d 909, 910 [2005]).

Plaintiff asserts that OGS agreed to the guarantee fee based on Kamdar's misrepresentation that he and his wife were required by the surety to pledge their personal assets as collateral in order to obtain the necessary bonds. Plaintiff relies on correspondence between OGS and Kamdar exchanged during

negotiations over the guarantee fee in which, at times, Kamdar states that the surety demanded "collateral" from Kamdar and his wife, although it is clear that the surety never required Kamdar or his spouse to provide actual collateral of any kind. At one point OGS demanded that Kamdar provide verification from the surety that demonstrated Kamdar's actual costs to secure the bonds. In response, Kamdar presented copies of the invoices for the premium payments—which were already contemplated and subsumed within the contract price—and an invoice that had been created by Kamdar and his wife and submitted to ISS in March 1998 for $434,765 of "collateral." When OGS informed Kamdar that providing collateral did not constitute "a reimbursable cost since the collateral will be returned when the contract is completed," Kamdar insisted that reimbursement was justified as an out-of-pocket expense to ISS, and submitted a copy of the minutes from an ISS share-holder meeting that took place between himself (as 91% owner of the company) and one other shareholder, in which ISS agreed to pay Kamdar and his wife a fee of $87.50 per $1,000 of the amount of the value of the work to be performed under the contract in exchange for their performance guarantee and pledge of their personal collateral.

Thus, clearly, some evidence exists that Kamdar represented that he and his wife were required to pledge collateral to back the surety. On the other hand, the record is replete with in-stances where communications between the parties suggest that OGS should have been aware that the expense for which Kamdar demanded reimbursement was not physical collateral, but the risk to which he and his wife, and their personal assets, were exposed as a result of the personal guarantee which they provided to the surety. The record evidence clearly establishes that the surety did require Kamdar and his wife to sign the indemnity agreement individually, as indemnitors, which would have permitted the surety to seek recourse against them person-ally should ISS default and the surety have to pay plaintiff under the performance bonds. Significantly, when plaintiff pressed Kamdar for a description of the collateral allegedly demanded by the surety, Kamdar responded by sending a copy of the surety's general indemnity agreement, which clearly required personal guarantees of the indemnitors, but no physi-cal collateral. Kamdar included a note stating, "As you can see[,] the attached agreement is so broad that [the surety] will not limit themselves by giving a letter stating [the] amount of collateral[,] it's based on my financial statement[;] they put this together with all my assets as collateral and any future assets that I acquire." This correspondence directs plaintiff to look to

the general indemnity agreement for proof of the risk that Kamdar was undertaking and that agreement clearly contains a guarantee provision, but no requirement that Kamdar provide actual collateral. Kamdar's representations, when juxtaposed against his interpretation of the general indemnity agreement as evinced by this correspondence, suggest that he was using the word "collateral" interchangeably with the risk to his personal assets that stemmed from his personal guarantee.

Other statements made by Kamdar that plaintiff offers as affirmative misrepresentations that he was obligated to provide collateral to the surety could also be interpreted as mere inaccuracies made by Kamdar in attempting to describe the risk to himself and his wife which flowed from the surety's demand for their personal guarantee.[3] While this evidence is sufficient to indicate that Kamdar misused the word "collateral," and perhaps even sufficient to demonstrate that such misuse was intentional, in our view, Kamdar's misrepresentations, taken as a whole and posited against all the information that plaintiff had before it when evaluating Kamdar's demand for the guarantee fee, are insufficient to establish fraud. Specifically, on the record before us, clear and convincing evidence does not exist that the alleged misrepresentations constituted a material fact which justifiably induced OGS to agree to the guarantee provision. With regard to the element of reliance, "[w]here a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he [or she] cannot claim justifiable reliance on [the] defendant's misrepresentations" (*Tanzman v La Pietra*, 8 AD3d at 707 [internal quotation marks and citation omitted]). Here, after OGS repeatedly demanded proof of collateral from Kamdar, Kamdar sent the general indemnity agreement—which included no collateral requirement—and reminded OGS that he had obtained the necessary bonds and that the nature of the collateral should not be its concern. It is also noteworthy that

---

**3.** For example, Kamdar sent a letter to OGS official William O'Connor which stated that the "only way a company like mine can obtain a bond from the largest bonding company in the US, is directly due to the fact that I put up my life savings to secure it." This statement is consistent with the personal guarantee that he was required to give. The only evidence that Kamdar ever represented that he would have to post specific assets as security comes from the vague testimony of Jerry Lipfeld, an auditor with the Office of the State Comptroller, who testified at trial that Kamdar led him to believe that ISS could not attain the bonds without someone putting up collateral: "I remember something about his wife's jewels and there was other securities that I never saw." Lipfeld testified that the cost asserted by Kamdar was the fact that he would lose the opportunity to use those valuables as security in some other transaction.

the contract between the parties refers to the fee as a "Guarantee" cost. Under these circumstances, with clear documentary evidence to the contrary and little evidence of any specific, affirmative representations by Kamdar that he had designated any particular assets as collateral, it simply cannot be said that OGS justifiably relied on the fact that the surety had demanded collateral when it agreed to the excessively generous guarantee provision (*see Lusins v Cohen* 49 AD3d 1015, 1017-1018 [2008]; *Mann v Rusk*, 14 AD3d at 910). Accordingly, the finding of fraud against defendants must be reversed (*see Tanzman v La Pietra*, 8 AD3d at 707-708; *Shultis v Reichel-Shultis*, 1 AD3d 876, 877-878 [2003]; *Bibeau v Ward*, 228 AD2d 943, 943-944 [1996], *lv denied* 89 NY2d 804 [1996]).

We hold, as well, that no breach of contract occurred. In asserting that the parties intended to impose a cap on the guarantee fee, plaintiff relies on a letter sent to Kamdar in April 1998 by OGS Contract Administration Director Robert Kainz which summarized the payment methodology of the guarantee cost and specifically stated that the guarantee cost "will not exceed $402,000." This letter, however, was written prior to the change orders, and could thus be construed as a reflection of the maximum amount that could be imposed based on the contract amount at that time, but not an absolute cap should the contract price increase. Kainz also testified that it was his understanding that the fee would be capped at $402,000, as did Martin DePoalo, an OGS employee in charge of the tank remediation projects.

However, this testimony must be viewed against OGS's actual conduct in its performance under the contract (*see Green Harbour Homeowners' Assn., Inc. v G.H. Dev. & Constr., Inc.*, 14 AD3d 963, 965-966 [2005]; *Matter of Big Tree Energy Partners v Bradford*, 219 AD2d 27, 30-31 [1996], *lv denied* 88 NY2d 810 [1996]). First, OGS had rejected Kamdar's originally proposed lump sum amount of the cost of obtaining the bond and, instead, proposed a formula for calculating that amount as a function of the contract price. Given that ambiguities inherent in that formula "must be construed most strongly against plaintiff, the drafter" (*Cone v Stranahan*, 44 AD3d 1145, 1147 n 1 [2007]; *see Agostinelli v Stein*, 17 AD3d 982, 985 [2005], *lv dismissed* 5 NY3d 824 [2005]), we construe the formula as we would ordinarily construe a mathematical formula, i.e., as a function of its components. The conclusion that no cap was intended is also supported by OGS's course of performance during the contract in that OGS continued to pay the guarantee fee even when, due to the change orders, the amount almost tripled the

fee amount derived from the original contract price (*see Matter of Big Tree Energy Partners v Bradford*, 219 AD2d at 30-31). Finally, John Lewyckyj—Director of Contract Administration for OGS—admitted, after reviewing the contract and the guarantee cost provision, that the contract contained no provision "that would have limited the fee" to the stated amount of $402,000.

We have weighed this evidence and considered the undisputed fact that defendants fully performed under the contract at a cost which was nearly a million dollars less than the next lowest bidder, representing—once the contract amount was tripled by change orders—a savings to the taxpayers of approximately three million dollars. In sum, because in our view the evidence does not adequately support the conclusion that the parties intended to cap the guarantee fee, we hold that plaintiff has failed to prove that any breach of contract occurred.

In light of our conclusion that the contract provision at issue was enforceable, plaintiff's unjust enrichment claim must be dismissed as duplicative of the breach of contract cause of action (*see Eagle Comtronics v Pico Prods.*, 256 AD2d 1202, 1202-1203 [1998], *lv denied* 688 NYS2d 372 [1999] [the "existence of a valid and enforceable written contract governing a particular subject matter precludes recovery in quasi-contract or unjust enrichment"]; *cf. Taylor & Jennings v Bellino Bros. Constr. Co.*, 106 AD2d 779, 780 [1984] [recovery under equitable doctrine permitted after contract voided as induced by fraud]). Plaintiff's cause of action for misappropriation of public funds, premised as it is on breach of contract and fraud, must also be dismissed.

Given our disposition, we need not reach defendants' remaining contentions.

Lahtinen, Kane, Malone Jr. and Stein, JJ., concur. Ordered that the order and judgment is reversed, on the law, without costs, and complaint dismissed.