**VCG SPECIAL OPPORTUNITIES MASTER FUND LIMITED,**
Plaintiff,

v.

**CITIBANK, N.A., Defendant.**

Citibank, N.A., Counterclaim–Plaintiff

v.

**VCG Special Opportunities Master Fund Limited, Counterclaim–Defendant.**

No. 08–CV–01563 (BSJ).

United States District Court,
S.D. New York.

Nov. 5, 2008.

Steven Glen Mintz, Terence William McCormick, Mintz & Gold LLP, New York City, NY, for Plaintiff/Counter Defendant.

Allan J. Arffa, Paul, Karen R. King, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant.

## *OPINION AND ORDER*

BARBARA S. JONES, District Judge.

Defendant and Counterclaim–Plaintiff Citibank, N.A. ("Citibank") moves this Court for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, dismissing the complaint of Plaintiff and Counterclaim–Defendant VCG Special Opportunities Master Fund Limited ("VCG") and entering judgment in its favor on its counterclaim. For the reasons that follow, Citibank's motion is GRANTED; thus, the request for a stay of discovery pending the resolution of the instant motion is DENIED as moot.

## BACKGROUND [1]

This action arises from a credit default swap (or "CDS") transaction between VCG and Citibank, by which VCG sold Citibank credit protection against the risk of a credit default by a collateralized debt obligation (or "CDO"). (Compl. ¶ 10.) In a typical CDS transaction of this kind, the "protection buyer" makes regular pay-

ments to a "protection seller," with "reference" to a specific credit obligation. (Citibank's Mem. Supp. J. on Pleadings ("Citibank's Mem.") at 1.) The credit obligation is generally referred to as the "reference obligation," and the issuer of that obligation is generally referred to as the "reference entity." (*Id.*) In return for receiving the protection buyer's payments, the protection seller agrees to undertake the credit exposure of the underlying reference obligation. (Compl. ¶ 11.)

### *The Parties' CDS Transaction*

The primary contract documents governing the parties' rights and obligations under the CDS transaction are the 2002 version of the Master Agreement of the International Swap Dealers Association ("ISDA"), dated September 1, 2006 (the "ISDA Master Agreement"); the Schedule to the ISDA Master Agreement, dated September 1, 2006 (the "Schedule"); the 1994 ISDA Credit Support Annex, dated September 1, 2006 (the "Credit Support Annex"); and the Confirmation Letter by Citibank, dated July 5, 2007 (the "Confirmation Letter"). (Compl. ¶ 13.) The Confirmation Letter incorporates the 2003 ISDA Credit Derivatives Definitions and the ISDA Standard Terms Supplement for use with Credit Transactions on Collateralized Debt Obligation with Pay–As–You–Go or Physical Settlement (the "Standard Terms Supplement"). (Compl. ¶ 13.) In the event of any inconsistency between the Confirmation Letter and the ISDA Master Agreement, the terms of the Confirmation Letter control. (Compl. ¶ 14; Arffa Decl., Ex. 1 (ISDA Master Agreement), at 1.)

Pursuant to these documents (collectively, the "CDS Contract"), Citibank acted as the protection buyer in the parties' transaction. (Compl. ¶ 10.) Citibank agreed to

---

1. The following facts are drawn from the pleadings, the parties' motion papers, and the contractual documents submitted as exhibits to the instant motion. Unless otherwise noted, these facts are not in dispute.

make, for the term of the CDS Contract,[2] periodic "Fixed Payments" to VCG based on a fixed percentage of 5.50% per annum on an "Initial Face Amount" of the reference obligation, Class B Notes. The Class B Notes were issued by the reference entity, the Millstone III CDO Ltd. III–A (the "Millstone III CDO").[3] (Compl. ¶ 12.)

VCG acted as the protection seller for the CDS transaction. As protection seller, VCG undertook the default risk of the reference obligation; that is, VCG agreed to pay Citibank a "Floating Payment" if certain credit events (or "Floating Amount Events") took place during the term of the CDS Contract. (Compl. ¶ 16.) VCG also agreed to deposit collateral at the time of the execution of the CDS Contract to secure Citibank against the risk that VCG would not be in a position to make the Floating Payments. (Compl. ¶ 15.) This collateral is called the "Independent Amount," the amount of which was specified in the Confirmation Letter. (Arffa Decl., Ex. 3 (Confirmation Letter), at 3.)

### Citibank Demands Additional Credit Support

Apart from the Independent Amount, some CDS transactions allow the protection buyer to demand additional collateral (or "variation margin") based upon a downward movement in the daily "mark-to-market value" of the underlying reference obligation.[4] (Compl. ¶ 18.) The parties disagree on whether the CDS Contract allowed Citibank to demand variation margin from VCG. (Compl. ¶ 17.) The record reflects, however, that on August 1, 2007, Citibank demanded additional collateral from VCG. (Compl. ¶ 20.) Citibank demanded additional collateral from VCG three more times over the weeks that followed. (Compl. ¶ 20.) VCG alleges that while it delivered the sums requested, it nonetheless questioned Citibank's evaluation of the credit risk of the Class B Notes. (Compl. ¶ 25.) Further, VCG maintains that it delivered the sums out of fear that Citibank might seize upon VCG's refusal to post variation margin as a reason to declare a technical default and seize VCG's collateral. (Compl. ¶ 26.)

### Declaration of a Floating Amount Event

Pursuant to the Standard Terms Supplement, the Floating Amount Events included a "Failure to Pay Principal," an "Interest Shortfall," or a "Writedown," each with respect to the reference obligation. (Arffa Decl., Ex. 4 (Standard Terms Supplement), at 7.) On January 9, 2008, Citibank sent VCG a "Floating Amount Event Notice," stating in relevant part:

This letter is notice to you that an Implied Writedown has occurred with respect to the Reference Obligation on or about January 4, 2008. The Implied Writedown Amount in respect of such

---

**2.** The term of the CDS Contract was to run until the final maturity date of the reference obligation in July 2046, subject to any earlier amortization or liquidation of the reference obligation, or any early termination of the CDS Contract. (Arffa Decl., Ex. 3 (Confirmation Letter), Ex. 4 (Standard Terms Supplement) ¶¶ 1, 2.)

**3.** Neither VCG nor Citibank own the Millstone III CDO. (Compl. ¶ 12, n. 1.) Rather, the parties simply trade in, or "hedge," the CDO's credit risk. *Aon Fin. Prods., Inc. v. Société Générale*, 476 F.3d 90, 96 (2d Cir.

2007). The swap is not a contract of indemnity, but an instrumentality to shift default risk.

**4.** "Mark-to-market" is a term of art in the financial and accounting industries. (Pl.'s Mem. Opp'n Citibank's Mot. for J. on Pleadings ("Pl.'s Opp'n") at 7.) When an institution marks an asset to market, it assesses and records on its books a change in the asset's value since the last time a valuation took place, whether the gain (or loss) is realized or not. (*Id.*)

Floating Amount Event is USD 10,000,-000.00 (the "Floating Amount").

(Compl. ¶ 35.) In other words, Citibank informed VCG that the Floating Payment Amount was due on the ground that an Implied Writedown had taken place. (Compl. ¶ 36.)

According to the definition of "Implied Writedown Amount" provided in the Standard Terms Supplement,

"Implied Writedown Amount" means, (i) if the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies or realized losses as described in (i) of the definition of "Writedown" to occur in respect of the Reference Obligation, on any Reference Obligation Payment Date, *an amount determined by the Calculation Agent [Citibank] equal to the excess, if any, of the Current Period Implied Writedown Amount over the Previous Period Implied Writedown Amount, in each case in respect of the Reference Obligation Calculation Period to which such Reference Obligation Payment Date relates, and (ii) in any other case, zero.*

(Compl. ¶ 38; Arffa Decl., Ex. 4 (Standard Terms Supplement), at 19 (emphasis added).) "Writedown," in turn, is defined in relevant part as the occurrence at any time on or after the Effective Date of:

(i)(A) a writedown or applied loss (however, described in the Underlying Instruments) resulting in a reduction in the Outstanding Principal Amount (other than as a result of a scheduled or unscheduled payment of principal); or

(B) the attribution of a principal deficiency or realized loss (however described in the Underlying Instruments) to the Reference Obligation resulting in a reduction or subordination of the current interest payable on the Reference Obligation; ...

(iii) *if Implied Writedown is applicable and the Underlying Instruments do not provide for writedowns, applied losses, principal deficiencies, or realized losses as described in (i) above to occur in respect of the Reference Obligation, an Implied Writedown Amount being determined in respect of the Reference Obligation by the Calculation Agent.*

(Compl. ¶ 39; Arffa Decl., Ex. 4, at 23 (emphasis added).)

As reflected in the Confirmation Letter, an "Implied Writedown" was "Applicable" to this CDS transaction. (Arffa Decl., Ex. 3, at 2.) The parties disagree, however, on whether the Implied Writedown provision in the CDS Contract was exercised properly. This requires an initial determination of whether the Underlying Instruments to the Class B Notes provide for writedowns. If so, the Implied Writedown Amount is zero; if not, Citibank, as Calculation Agent, could determine an Implied Writedown Amount.

## DISCUSSION

### I. Standard of Review

 Judgment on the pleadings "is appropriate where material facts are undisputed and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Sellers v. M.C. Floor Crafters Inc.,* 842 F.2d 639, 642 (2d Cir.1988). "In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6) ... accept[ing] the allegations contained in the complaint as true, and draw[ing] all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). When analyzing a Rule 12(c) motion, the Court considers "the pleadings and exhib-

its attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings." *Prentice v. Apfel,* 11 F.Supp.2d 420, 424 (S.D.N.Y. 1998) (citing *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). A court should dispose of the claims on the pleadings "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.,* 47 F.3d 14, 16 (2d Cir. 1995).

## II. The Parties' Arguments

The gravamen of VCG's complaint is that Citibank improperly demanded from VCG additional collateral beyond the Independent Amount, and improperly declared a Floating Amount Event. (Compl. ¶¶ 26, 41, 47.) The Court turns first to the issue of whether a Floating Amount Event occurred.

### A. Floating Amount Event

■ There is no dispute that the Floating Amount Events that would trigger VCG's payment obligation to Citibank include: a "Failure to Pay Principal," an "Interest Shortfall," or a "Writedown." (Citibank's Mem. at 28; Pl.s Opp'n at 23–24; Arffa Decl., Ex. 4 (Standard Terms Supplement), at 7.) There is also no dispute that the reference obligation has not experienced either a Failure to Pay Principal or an Interest Shortfall. (Pl.'s Opp'n at 24.) Thus, the remaining question is whether a Writedown has taken place such that Citibank was entitled to demand VCG's Floating Payment obligation.

As reflected in the Confirmation Letter, the parties agree that "Implied Writedown" was "Applicable" to this CDS transaction and hence would constitute a "Writedown" as relevant to the CDS Contract. (Citibank's Mem. at 11; Pl.'s Opp'n at 24–26; Arffa Decl., Ex. 3 (Confirmation Letter), at 2.) Pursuant to the terms of the Standard Terms Supplement incorporated by the Confirmation Letter, the amount of an Implied Writedown is zero in any case where the reference obligation's "Underlying Instruments" expressly provide for "writedowns, applied losses, principal deficiencies or realized losses" to occur. (Arffa Decl., Ex. 4 (Standard Terms Supplement), at 23.) Where the reference obligation's Underlying Instruments do *not* provide for such events, the Calculation Agent is to determine whether an Implied Writedown has occurred. (*Id.*)

VCG asserts that the Indenture between Millstone III CDO, Ltd., Millstone III CDO, LLC, and JP Morgan Chase Bank, N.A., dated July 5, 2006 (the "Millstone III Indenture"), actually provides for writedowns, applied losses, principal deficiencies and realized losses, which are passed on to the reference obligation, the Class B Notes. (Pl.'s Opp'n at 24.) In response, Citibank argues that there can be no "serious dispute" that the Millstone III Indenture does *not* permit any express writedowns, or any of the other events listed, of the principal amounts of the Class B Notes. (Citibank's Mem. at 28.) Thus, Citibank, as the designated Calculation Agent, properly calculated the Implied Writedown Amount resulting in the Floating Payment obligation. (*Id.* at 29.)

The crux of the parties' disagreement centers on whether the portion of the Millstone III Indenture that accounts for a "Written Down Amount" concerns the reference obligation at issue, the Class B

Notes, or instead refers to the possibility of the Millstone III CDO's securities being written down, which is not the type of Writedown contemplated in the CDS Contract. The Millstone III Indenture provides in relevant part:

> "Written Down Amount" means the sum, [sic] respect to each Written Down Security, of the amount to which the original Principal Balance of such Written Down Security is reduced as notified by or on behalf of the related issuer or trustee to the holders of such Written Down Security (including appraisal reductions on CMBS Securities).

> "Written–Down Security" means any Collateral Asset (other than a Defaulted Obligation) as to which the aggregate par amount of such Collateral Asset and all other securities secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to such Collateral Asset exceeds the aggregate par amount (including reserved interest or other amounts available for overcollateralization) of all collateral securing such securities (excluding defaulted collateral)

(McCormick Decl., Ex. 7, at 77–78.) Based upon this language, VCG contends that if a "Written Down Amount" is reported,[5] the outstanding principal amount of collateral in the pool available for distribution to noteholders, including Class B noteholders, is decreased. (Pl.'s Opp'n at 25–26.) Assuming that the first class of notes affected were the Class B Notes, "writedowns, applied losses, principal deficiencies or realized losses" would, by definition, occur in respect of the reference

obligation. (*Id.* at 26.) In this regard, pursuant to the terms of the Standard Terms Supplement, VCG posits that the amount of the Implied Writedown is zero. (*Id.*; Arffa Decl., Ex. 4 (Standard Terms Supplement), at 19 (" 'Implied Writedown Amount' means, (i) if the Underlying do not provide for writedowns ... an amount determined by the Calculation Agent ..., and (ii) in any other case, zero.").)

VCG's interpretation of the Millstone III Indenture is flawed in that the cited definition of "Written Down Amount" does not involve writedowns of the Class B Notes issued by the Millstone III CDO. Instead, the "Written Down Amount" refers to securities owned by the CDO. In other words, VCG confuses the CDO's assets (the securities it owns) with its liabilities (the securities it issues). The Class B Notes of the CDO are debt obligations *issued by* the Millstone III CDO; they are not a type of collateral asset *held by* the CDO.

Moreover, the Court is unpersuaded by VCG's claim that writedowns of the collateral assets owned by the Millstone III CDO is the equivalent of a writedown of the Class B Notes because a reduced collateral pool will be available for distribution to the noteholders in accordance with the priorities of payments of the CDO's obligations. (Pl.'s Opp'n at 24–26.) Rather, under the Millstone III Indenture, deterioration in the CDO's collateral assets and any payment shortfalls do not result in any writedown of the principal amount of the *reference obligation*, which is the type of writedown contemplated under the

---

5. Before sums payable to the noteholders are allocated according to a priority of payments identified in Section 11.1 of the Millstone III Indenture (the "waterfall"), the issuer of the CDS is required to prepare a "Note Valuation Report," pursuant to Section 10.6(a) of the Indenture. Among other data taken into account in the Note Valuation Report is "a calculation showing the determination of the Net Outstanding Portfolio Collateral Balance," which in turn takes in to account the "Written Down Amount," quoted above. (Pl.'s Opp'n at 25.)

CDS Contract. (Arffa Decl., Ex. 4 (Standard Terms Supplement), at 23 ("[I]f Implied Writedown is applicable and the Underlying Instruments to not provide for writedowns ... *in respect of the Reference Obligation,* an Implied Writedown Amount being determined *in respect of the Reference Obligation* by the Calculation Agent.") (emphasis added).) Thus, even if the collateral securities realize losses, the Class B Notes remain outstanding at their full principal amount, subject to the availability of funds. That is presumably why, in such a situation, the parties agreed that an Implied Writedown feature applies.

In sum, the Confirmation Letter makes clear that Implied Writedowns are applicable to this CDS transaction. Because the Millstone III Indenture does not expressly provide for writedowns of the Class B Notes, under the terms of the CDS Contract it is Citibank's responsibility, as the Calculation Agent, to determine whether an Implied Writedown has occurred. The CDS Contract sets forth a mathematical formula by which to calculate the Implied Writedown Amount. VCG does not challenge the use of this formula.[6] Accordingly, the Court holds that Citibank properly determined that a Floating Amount Event in the form of an Implied Writedown occurred under the CDS Contract. Citibank's motion for judgment on the pleadings is therefore granted, and VCG's claim for a declaratory judgment based upon the non-occurrence of a Floating Amount Event is dismissed.

### B. Additional Collateral

■ VCG argues that Citibank's requests for additional collateral were inconsistent with the terms set forth in the Confirmation Letter that the parties signed as part of the CDS Contract. The Court disagrees. The Credit Support Annex allowed for Citibank to request additional collateral from VCG depending upon Citibank's calculation of its "Exposure," or the amount of loss Citibank would incur (or gains it would realize) in replacing the CDS transaction with an economically equivalent transaction at the time of calculation. (Arffa Decl., Ex. 2 (Credit Support Annex) ¶¶ 3–4; Citibank's Mem. at 7.) In turn, the Confirmation Letter states clearly that "[t]his Transaction shall be subject to the Credit Support Annex ... between Citibank and [VCG]." (Arffa Decl., Ex. 3, at 3.) The Court finds nothing in the Confirmation Letter that modifies VCG's obligation to transfer additional collateral as set forth in the Credit Support Annex.

■ Further, whether or not any inconsistency exists, VCG's challenge is waived in light of its continued agreement to post additional collateral. "It is well-established that where a party to an agreement has actual knowledge of another party's breach and continues to perform under and accepts the benefits of the contract, such continuing performance constitutes a waiver of the breach." *Nat'l Westminster Bank, U.S.A. v. Ross,* 130 B.R. 656, 675 (S.D.N.Y.1991), *aff'd sub nom., Yaeger v. Nat'l Westminster,* 962 F.2d 1 (2d Cir.1992). Although VCG maintains that it "believed it was not obligated to pay the sums demanded by Citibank," it nonetheless continued to post the sums requested "because it was concerned that Citibank might seize upon [VCG's] refusal to post variation margin as an excuse to declare a technical default and seize [its] collateral." (Compl. ¶ 26.) Given VCG's

---

**6.** Rather, VCG claims that even if Citibank had been correct in determining that a Floating Amount Event occurred, there remains a controversy over whether Citibank's conduct in determining the Floating Payment Amount was commercially reasonable. (Pl.'s Opp'n at 33–34.) For reasons described *infra,* Part II.D, this challenge fails.

actual posting of the disputed credit support, and its receipt of Citibank's regular payments during this time, VCG cannot now claim that Citibank breached the CDS Contract by wrongly demanding additional collateral.

▮ The Court also notes that the Credit Support Annex contains a Dispute Resolution provision as a mechanism to challenge Citibank's Exposure determinations or demands for additional collateral. (Citibank's Mem. at 10; Arffa Decl., Ex. 2 (Credit Support Annex), at 3.) VCG concedes that it did not invoke this Dispute Resolution provision. (Pl.'s Opp'n at 22.) It argues that doing so would have been meaningless, as the parties had not yet finished discussing the issue of variation margin before Citibank declared that a Floating Amount Event had occurred. (*Id.*) This position suggests that the Dispute Resolution process was optional instead of mandatory. New York public policy, however, favors alternative dispute resolution mechanisms that reflect the informed negotiation and endorsement of the parties. *See, e.g., Ferguson Elec. Co. Inc. v. Kendal at Ithaca Inc.*, 274 A.D.2d 890, 711 N.Y.S.2d 246, 249 (2000) (citing *Matter of Nationwide Gen. Ins. Co. v. Investors Ins. Co. of Am.*, 37 N.Y.2d 91, 371 N.Y.S.2d 463, 332 N.E.2d 333 (1975)); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 82 N.Y.2d 47, 603 N.Y.S.2d 404, 623 N.E.2d 531 (1993). As VCG was aware of the expedited Dispute Resolution clause set forth in the CDS Contract, VCG cannot now challenge Citibank's request for additional collateral without having first vetted this claim in the manner agreed upon in the CDS Contract. *See Acme Supply Co., Ltd. v. City of New York*, 39 A.D.3d 331, 834 N.Y.S.2d 142, 143 (2007) (construing clauses providing for alternative dispute resolution mechanisms as mandatory is supported by the long-standing principle under New York law that contracts are to be interpreted in a manner that would give full effect to all provisions). VCG's claim that Citibank wrongly demanded variation margin therefore fails.

## C. VCG's Alternative Claims

VCG alleges in the alternative claims of rescission, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and conversion. (Compl. ¶¶ 48–50, 55–66.) For the following reasons, these claims are without merit.

### 1. Rescission

▮ VCG claims that it believed it was agreeing "to sell credit protection on a credit default swap" and "not to take the risk of daily mark-to-market movement in the value of the reference obligation." (Compl. ¶ 49.) It further claims that the Complaint presents questions "that can only be resolved by discovery and expert testimony at trial." (Pl.'s Opp'n at 28.) The Court disagrees. The CDS Contract is governed by New York law. (Arffa Decl., Ex. 1 (Schedule), at 12 ("This Agreement will be governed by and construed in accordance with the laws of the State of New York.").) Under New York law, rescission of a contract on the basis of a unilateral mistake may be had if a party establishes that "(i) he entered into a contract based upon a mistake as to a material fact, and that (ii) the other contracting party either knew or should have known that such a mistake was being made." *NCR Corp. v. Lemelson Medical, Educ. and Research Foundation*, No. 99 Civ. 3017(KNF), 2001 WL 1911024, at *7 (S.D.N.Y.2001), *aff'd*, 33 Fed.Appx. 7 (2d Cir.2002). Furthermore, "[a] contract may be voided on the ground of unilateral mistake of fact only where the enforcement of the contract would be unconscionable, the mistake is material and made despite the exercise of ordinary care by the party in

error." *William E. McClain Realty, Inc. v. Rivers*, 144 A.D.2d 216, 534 N.Y.S.2d 530, 531 (1988); *see Morey v. Sings*, 174 A.D.2d 870, 570 N.Y.S.2d 864, 867 (1991). But rescission of a contract is not appropriate where a unilateral mistake is the product of negligence. *See NCR Corp.*, 2001 WL 1911024, at *7.

VCG's claim of entitlement to rescission based upon unilateral mistake is not supportable here. First, the language of the Credit Support Annex makes clear that Citibank may request additional collateral from VCG depending on the current value of the CDS Contract at the time of Citibank's calculation of its Exposure. (Arffa Decl., Ex. 2 ¶¶ 3–4; Citibank's Mem. at 7.) Second, VCG is a sophisticated hedge fund. No claim has been made by VCG that it was limited in its ability to review drafts of the agreement or to discuss the provisions of the CDS Contract before it was executed. Notwithstanding VCG's assertions to the contrary, it appears that the instant case presents a circumstance where VCG, a sophisticated hedge fund, simply failed to review carefully the terms of the parties' agreement. If VCG was negligent in this regard, this does not justify rescission. *See Da Silva v. Musso*, 53 N.Y.2d 543, 444 N.Y.S.2d 50, 428 N.E.2d 382, 386 (1981).

### 2. Breach of the Implied Covenant of Good Faith and Fair Dealing

 VCG next contends that Citibank breached the implied covenant of good faith and fair dealing by "making oppressive [variation] margin demands without justification" (Compl. ¶ 56), and by abusing the measure of discretion given to it as Calculation Agent. (Pl.'s Opp'n at 31–32.) With regard to VCG's allegation of a breach of the implied covenant on the

basis of variation margin, as discussed *supra*, this claim is waived in light of VCG's continued posting of the demanded collateral and acceptance of the benefits of the CDS Contract. *See* Part II.B. With regard to VCG's allegation that Citibank abused its discretion as Calculation Agent, while it is true that under New York law a claim for arbitrary or irrational exercise of discretion under a contract can be separate and apart from a breach of contract claim, *see e.g., Maddaloni Jewelers, Inc. v. Rolex Watch U.S.A., Inc.*, 41 A.D.3d 269, 838 N.Y.S.2d 536 (2007); *Outback/Empire I, Ltd. P'ship v. Kamitis, Inc.*, 35 A.D.3d 563, 825 N.Y.S.2d 747 (2006), VCG does not adduce specific facts of arbitrary or irrational conduct relating to Citibank's position as Calculation Agent. Indeed, in its opposition papers, VCG supports its claim by relying upon Citibank's supposedly unjustified demands of variation margin. (Pl.'s Opp'n at 32.) Because that challenge is waived, however, the Court concludes that VCG has failed to state a claim for breach of the implied covenant of good faith and fair dealing.[7]

### 3. Unjust Enrichment and Conversion

 In the alternative of its breach of contract claim, VCG asserts claims for unjust enrichment and conversion. In New York, a party is not precluded from proceeding on both breach of contract and unjust enrichment (or quasi-contract) theories where there is a bona fide dispute as to the existence of the contract, or where the contract does not cover the dispute in issue. *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 19 A.D.3d 107, 796 N.Y.S.2d 77, 81 (2005); *Zuccarini v. Ziff-Davis Media, Inc.*, 306 A.D.2d 404, 762 N.Y.S.2d 621 (2003). Here, VCG alleges

---

7. To the extent VCG alleges that Citibank acted arbitrarily or irrationally because of its commercially unreasonable financial assess- ment of the Class B Notes, this claim fails for the reasons stated *infra, see* Part II.D.

that it has pled a cause of action for rescission and, if successful, the rescission cause of action would vitiate the CDS Contract and give rise to a claim for unjust enrichment and conversion, arising from Citibank's demand for variation margin from VCG. (Pl.'s Opp'n at 33.) In light of the Court's conclusion that VCG cannot state a claim for rescission, VCG's claims for unjust enrichment and conversion necessarily fail as being duplicative of VCG's claim for breach of contract. These claims are therefore dismissed. *See, e.g., State v. Indus. Site Serv., Inc.,* 52 A.D.3d 1153, 862 N.Y.S.2d 118, 124–25 (2008) (dismissing unjust enrichment claim as being duplicative of breach of contract claim); *Retty Fin., Inc. v. Morgan Stanley Dean Witter & Co.,* 293 A.D.2d 341, 740 N.Y.S.2d 198 (2002) (upholding dismissal of conversion and breach of fiduciary duty claims because they were duplicative of the breach of contract cause of action); *Peters Griffin Woodward, Inc. v. WCSC, Inc.,* 88 A.D.2d 883, 452 N.Y.S.2d 599 (1982).

## D. Citibank's Counterclaim

Citibank asserts a counterclaim for VCG's breach of contract due to VCG's failure to meet its Floating Payment obligation under the CDS Contract. (Citibank's Mem. at 20.) In response, VCG argues that Citibank is not entitled to judgment on the pleadings because the CDS Contract should be rescinded "on the ground of Citibank's material breaches prior to declaring an early termination of the contract and/or pursuant to the equitable doctrine of mistake." (Pl.'s Opp'n at 33.) As discussed above, these claims are without merit.

VCG also maintains that even if a Floating Amount Event occurred, there is an issue of fact regarding the commercial reasonableness of Citibank's Floating Payment calculation. (*Id.* at 33–34.) Specifically, VCG contends that it is entitled to discovery and an evidentiary hearing to test, *inter alia,* "whether [Citibank] considered the data in the servicer's report in making the Floating Payment calculation." (Pl.'s Opp'n at 37.) This argument might have merit if it related to a theory pled in the Complaint. It does not. The Complaint states: "Even if Citibank had been entitled to demand variation margin . . . , Citibank failed even to make a proper estimate of the required collateral. Had it based its calculation on the servicer's report, it would never have demanded anything approaching the sums that it collected from Plaintiff." (Compl. ¶ 33.) The Complaint speaks to commercial unreasonableness in the context of the variation margin demands, *not* the Floating Payment calculation. VCG may not use its moving papers to amend the Complaint by arguing that the determination of the Floating Payment Amount in the CDS Contract was commercially unreasonable.[8] *See Shah v. Helen Hayes Hosp.,* 252 Fed.

**8.** In any event, VCG's moving papers fail to support its broad assertion. Notably, VCG primarily discusses commercial unreasonableness in the context of Citibank's demands for additional collateral. (Pl.'s Opp'n at 19–22.) With respect to Citibank's counterclaim, VCG supports its argument by referencing "the replacement value of the swap transaction," the "market conditions at the time of termination," and whether Citibank was "actually exposed to market risk"-all issues relating to whether Citibank improperly demanded variation margin from VCG. (Pl.'s Opp'n at 37–38.) Although VCG makes a passing reference to whether Citibank considered "data in the servicer's report in making the Floating Payment calculation," VCG does not specify which data was supposedly overlooked. (Pl.'s Opp'n at 37.) Assuming that VCG is referring to its assertion in the Complaint that the Servicer's Report "revealed that no credit event had yet taken place" for the monthly period of October 31, 2007 to November 29, 2007 (Compl. ¶¶ 28–29), this still does not help VCG's argument. The CDS Contract requires that the mathematical ratios used in

Appx. 364, 366 (2d Cir.2007) ("A party may not use his or her opposition to a dispositive motion as a means to amend the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998)). Further, any challenge, including commercial reasonableness, to Citibank's requests for variation margin is waived. *See* Part II.B. Citibank is thus entitled to judgment on the pleadings as to its counterclaim request for the remaining balance of the Floating Payment Amount minus the previously deposited variation margin— $674,252.38.

## CONCLUSION

For reasons discussed above, Citibank's motion for judgment on the pleadings is GRANTED. The Clerk of the Court is requested to enter judgment dismissing the complaint and granting Citibank's counterclaim.

**SO ORDERED.**

the Calculation Agent's Implied Writedown Amount be taken directly from the "Servicer Reports." (Arffa Decl., Ex. 4, at 20, 22.) Citibank argues, and the record demonstrates, that the Servicer Report was, in fact, consulted. (Citibank's Mem. at 12–13; Citibank's Reply Mem. at 10 n. 5; Arffa Decl., Ex. 8 (Floating Amount Event Notice, attaching a copy of "the relevant Servicer Report").) Thus, it is unclear what, if any, merit there is to VCG's claim. Without any pleadings in the Complaint, however, the Court need not decide the issue.