Andrias, J.E, and Gische, J.,
dissent in part in a memorandum by Andrias, J.E, as follows: In this dispute arising out of a Total Return Swap agreement between hedge fund BDC and Barclays Bank, each party asserts that it was entitled to terminate the agreement based on the other’s alleged default in transferring collateral. The motion court denied BDC’s motion for summary judgment on its breach of contract and declaratory judgment claims, granted Barclays’ motion for summary judgment to the extent of dismissing that portion of BDC’s breach of contract claim alleging that Barclays was required to pay the full amount of BDC’s October 6, 2008 collateral call prior to disputing it, and denied Barclays’ motion for summary judgment as to its counterclaims.
The majority would modify to grant BDC summary judgment, based on BDC’s argument that even if Barclays was entitled to dispute BDC’s October 6, 2008 collateral call before paying it, Barclays did not follow the dispute mechanism set forth in the parties’ agreement. Because I believe that issues of fact exist in this regard, I respectfully dissent.
The agreement consists of a Master Agreement, a Schedule and a Credit Support Annex (CSA), all on ISDA forms, and a Master Confirmation drafted by the parties. The CSA allowed BDC to request a “Return Amount” of what it calculated to be excess collateral based on changes in the value of the Reference Assets (debt instruments). The CSA’s “Transfer Timing” provision stated that the transfer of the Return Amount would be made by (i) the end of the next business day following a request made no later than the Notification Time (1:00 p.m.) or (ii) the end of the second business day following a request made after the Notification Time. In contrast, the “Delivery of Collateral” provision of the Master Confirmation Agreement provided that notwithstanding anything in the CSA to the contrary, Barclays “shall Transfer any Return Amounts in respect of Transactions not later than the Business Day following the Business Day on which” BDC requested it.
*589 The CSA suspended Barclays’ obligation to transfer a Return Amount following, among other things, notice of a dispute under the contractual procedure for resolving disputes over collateral calls. This included a two-step dispute resolution mechanism: (1) informal, under which the disputing party had to notify the other party of the dispute and transfer the undisputed amount to the other party, and the parties would attempt to resolve the dispute between themselves, and (2) formal, which required the party who made the collateral call to recalculate by seeking four quotations at mid-market from Reference Market makers, and use their average to determine the Reference Assets value.
Preliminarily, I believe that the motion court correctly found that Barclays was not required to pay the full amount of BDC’s $40 million collateral call prior to disputing it. “An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation” (Ruttenberg v Davidge Data Sys. Corp., 215 AD2d 191, 196 [1st Dept 1995]). Applying this principle, the delivery of collateral provision in the parties’ Master Confirmation Agreement should be read as modifying only the Transfer Timing provision of the CSA. Under this interpretation, the Master Confirmation Agreement does not modify any portion of CSA’s dispute resolution or conditions precedent provisions, which remain in full force and effect.
BDC’s reading of the agreements forces Barclays, not BDC, to pay first, then dispute any collateral call. The “court will endeavor to give the [contract] [the] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other” (Metropolitan Life Ins. Co. v Noble Lowndes Intl., 84 NY2d 430, 438 [1994] [internal quotation marks omitted]). This is because “[i]t is highly unlikely that two sophisticated business entities, each represented by counsel, would have agreed to such a harshly uneven allocation of economic power under the Agreement” (id.). As both parties were allowed to act as valuation agents with respect to collateral, it is illogical that the agreements would require only one party to pay first and dispute later. Reading the agreements as a whole so as to achieve the purpose of the parties, and giving all of the agreements’ provisions full force and effect, the motion court properly rejected BDC’s reading of the agreements as requiring Barclays to have paid the full amount of BDC’s October 6th collateral call prior to disputing a portion of it.
The majority disagrees, stating that the plain and unambiguous language of the Delivery of Collateral clause required *590 Barclays to transfer any Return Amount demanded by BDC no later than the business day following the demand. However, this interpretation is belied by BDC’s own conduct prior to the litigation. During the afternoon of October 7, 2008, BDC advised Barclays by email that “[a]t present, we have not received payment, nor has Barclay’s exercised its dispute right. We remind you that pursuant to paragraph 4 (b) and Paragraph 5 of the [CSA], by 5:00 p.m. today Barclays must either pay the amount set out in the request or exercise its dispute rights” (emphasis added). Consistent with this interpretation, in the “Notice of Failure to Transfer Return Amount” it sent to Barclays on October 8, 2007, BDC again stated that “[p]ursuant to Paragraph 4 (b) and Paragraph (5) of the CSA, by 5:00 p.m. NY time on Tuesday, October 7, 2008, Barclays was required to either (i) pay the relevant Return Amount or (ii) notify BDC that Barclay’s disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount” (emphasis added). Thus, BDC unequivocally advised Barclays that it had the right to pay or dispute and, at a minimum, BDC is bound by this interpretation of the contract with respect to its October 6th collateral call.
The majority finds that even if Barclays was entitled to pay or dispute, Barclays defaulted because it failed to tender either the full amount of BDC’s $40 million collateral call of October 6, 2008, or invoke the parties’ dispute mechanism by timely submitting the “undisputed amount” of $5,080,000 in full by October 7, 2008. The majority also finds that when BDC sent Barclays a “Notice of Failure to Transfer Return Amount” on October 8th, Barclays could only cure by remitting the full $40 million return amount within two days of the notice. The majority reasons that “[hjaving failed to timely pay the undisputed amount by the deadline, Barclays lost any right it may have had to suspend payment of the full $40 million.” I disagree and believe that the motion court correctly found issues of fact whether Barclays intended its communications with BDC following BDC’s October 6th collateral call to be a notice of dispute under the CSA, whether they imparted sufficient notice to BDC, and whether BDC complied with the informal dispute mechanism.
On October 6th, Barclays sent BDC a collateral call for the Return Amount of $11.75 million. Hours later, BDC sent Barclays a collateral call for the Return Amount of $40 million. BDC’s demand arose out of a dispute over Barclays’ methodology in calculating its own collateral calls. After the Lehman Brothers’ bankruptcy, Barclays changed its valuation method *591 because it believed the value of the underlying assets was falling faster than the previously used LoanX prices reflected. BDC claims this inflated Barclays’ collateral calls, which BDC continued to pay.
Upon receipt of BDC’s October 6th collateral call, Barclay’s immediately advised BDC that “[w]e do not agree with this call” and asked BDC if it wanted “to invoke the dispute mechanism.” BDC responded that it was not seeking to invoke the dispute mechanism, and that it was making its own collateral call for a Return Amount under the CSA, which was independent of any requests for Delivery Amounts made by Barclays, which BDC would continue to address in accordance with the agreement. Barclays responded that “[w]e show that BDC owes Barclays, not the other way around” and employees of the parties agreed later that day that BDC owed Barclays $13.52 million, which BDC paid. Thus, questions of fact exist as to whether there was any undisputed amount owed by Barclays to BDC when Barclays refused to pay the $40 million return amount on October 6, 2008, and whether Barclays’ responses that day, considered in light of the past practice of the parties, were sufficient to invoke the informal dispute resolution mechanism agreed to by the parties.
The majority states that Barclays has admitted that $5,080,000 was the undisputed amount of BDC’s October 6, 2008 collateral call and that this amount had to be paid by October 7th. However, it was not until October 7th that the parties began discussing whether Barclays was holding more collateral than it had asked for, and it was not until 4:05 p.m. that day that an employee of Barclays, after accounting for the payments that Barclays received from BDC on October 6th, advised BDC that “Barclays agrees to return 5,080,000. This is for margin call made on 10/6.” Thus, as BDC’s expert reported, “[i]t appears that BDC understood that the $5.08 million reflected excess collateral based on Barclays’ own valuations, not BDC’s,” and was not based on BDC’s $40 million demand. Specifically, Barclay’s demanded $11.75 million from BDC on October 6th and BDC made payments that day of $3.1 million and $13.52 million for a total of $16.53 million, resulting in an overpayment of $5.08 million. Consistent with this, the Judicial Admission on which the dissent relies, states in full: “Barclays denies Request No. 38, except admits that after receiving BDC wire transfers on October 6, 2008, Barclays concluded that $5,080,000 was the undisputed amount, as that term is used in the Credit Support Annex, of BDC’s October 6, 2008 collateral call” (emphasis added). Barclays has disputed in this litigation *592 that it owes any part of the $40 million demanded by BDC on October 6th, which was based on Barclays’ change in its valuation methods.
The next day, October 8th, Barclays transferred $5 million to BDC. Barclays asserts that the $80,000 balance was then deducted from its own collateral calls to BDC. Particularly, after making the $5 million payment, Barclays sent BDC a collateral call stating “[a]s of COB Oct 7, 2008 Barclays Bank PLC are calling for . . . $20,500,000 for value Oct 8, 2008.” After receiving a $7.25 million transfer from BDC on the morning of October 9th, Barclays reduced its collateral call from $20.5 million to $13.25 million, which BDC paid that afternoon. Barclays maintains that the amount of its collateral calls would have been $80,000 greater if Barclays had returned $5,080,000 the day before instead of $5 million. The ISDA Master Agreement does contemplate “netting,” stating that whenever amounts would otherwise be payable by each party to the other, in the same currency and with respect to the same transaction, the two amounts shall be set off and only the net amount shall be payable. Thus, a question of fact also exists as to whether Barclays paid the undisputed amount of $5,080,000 in full.
As to the timeliness of the payment, even if it was due on October 7th, on October 8, 2008, BDC sent Barclay’s a “Notice of Failure to Transfer Return Amount,” stating:
“Pursuant to Paragraph 4 (b) and Paragraph 5 of the CSA, by 5:00 p.m. NY time on Tuesday, October 7, 2008, Barclays was required to either (i) pay the relevant Return Amount or (ii) notify BDC that Barclays disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount. As of 5:00 p.m. NY time on October 7, BDC received neither payment or notice of dispute. Therefore, a Potential Event of Default has occurred under the Master Agreement with respect to Barclays.
“This notice constitutes a ‘notice of failure’ pursuant to Paragraph 7 (i) of the CSA. Please be advised that if this failure continues for two business days, an Event of Default will have occurred with respect to Barclays under Section 5 (a) (iii) (1) of the Master Agreement.”
Paragraph 7.1 refers to the failure to make, when due, a collateral payment “required to be made by [the party].” A failure to make a transfer does not become an Event of Default unless the non-defaulting party gives the allegedly defaulting party notice of a failure to perform and “that failure continues for two Local Business Days after notice of that failure is given to that party.”
*593 While the Notice of Failure references Barclays’ obligation to “(i) pay the relevant Return Amount or (ii) notify BDC that Barclays disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount,” in describing the “Potential Event of Default” it does not address Barclays’ alleged shortfall or untimeliness in remitting the undisputed amount of $5,080,000, and Barclays was not notified that it had defaulted in that respect. Rather, the notice states that “BDC received neither payment or notice of dispute.” As set forth above, the $5,080,000 figure was based on BDC’s overpayment of Barclays’ October 6th collateral calls, and an issues of fact exists as to whether Barclays provided BDC with adequate notice that it disputed BDC’s October 6, 2008 collateral call seeking the $40 million. Even if the “Potential Event of Default” is viewed as Barclays’ failure pay the Return Amount or notify BDC that it disputed the collateral and pay the undisputed amount, the notice gave Barclays two days to cure this failure and did not state that this could only be accomplished by paying the full Return Amount. Thus, even if Barclays was in default, contrary to the majority’s view, Barclays could cure by either paying the Return Amount or the undisputed amount. In holding otherwise, the majority focuses on the heading section of the notice, which reads “Notice of Failure to Transfer Return Amount.” However, I do not believe that the heading can be used to override the express language used therein.
Insofar as BDC claims it was entitled to declare an early termination of the agreements based on Barclays’ improper valuations of its own collateral calls, if BDC received a collateral call with which it disagreed, its only alternatives under the agreements were either (i) to pay Barclays, or (ii) to use the dispute resolution mechanism as mandated by paragraph 5 of the Credit Support Annex. Further, in holding that paragraph 5 gave BDC its exclusive recourse upon receiving an objectionable collateral call, the motion court properly found that the CSA’s dispute resolution process was a “mandatory” part of the “agreed upon” contract (see VCG Special Opportunities Master Fund Ltd. v Citibank, N.A., 594 F Supp 2d 334, 343 [SD NY 2008], affd 355 Fed Appx 507 [2d Cir 2009]). Accordingly, having failed to follow the CSA’s dispute resolution clause, BDC cannot seek to avoid that agreement’s requirements and retroactively challenge Barclays’ calculation of its post-September 15 collateral calls.
The motion court correctly found that it cannot be determined whether BDC defaulted with respect to the collateral calls made *594 by Barclays on October 10th and October 14th until it is determined whether Barclays first defaulted with respect to the October 6th collateral call.