**VOICEAGE CORPORATION, Plaintiff,**

v.

**REALNETWORKS, INC., Defendant.**

No. 12 Civ. 5753(KBF).

United States District Court,
S.D. New York.

Feb. 26, 2013.

Andrew Garry Gordon, Lewis Richard Clayton, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Plaintiff.

Lindsey Godfrey Eccles, Matthew Berry, Susman Godfrey L.L.P., Seattle, WA, Arun Srinivas Subramanian, William Christopher Carmody, Susman Godfrey LLP, New York, NY, Brian C. Howard, Brian Charles Howard, Ragesh Kumar Tangri, Durie Tangri LLP, San Francisco, CA, Bryan J.E. Caforio, Susman Godfrey L.L.P., Los Angeles, CA, for Defendant.

*MEMORANDUM DECISION*
*& ORDER*

KATHERINE B. FORREST, District Judge.

On July 3, 2012, plaintiff VoiceAge Corporation ("VoiceAge") sued defendant RealNetworks, Inc. ("RealNetworks") for breach of contract in New York State Supreme Court. On July 26, 2012, on the basis of diversity, RealNetworks removed the action to this Court. RealNetworks filed its first Answer on October 9, 2012. (ECF no. 27 (the "Answer").) Shortly thereafter, pursuant to Federal Rule of Civil Procedure 12(c), VoiceAge moved for judgment on the pleadings. (ECF no. 29.)

Motions for judgment on the pleadings are an underutilized tool for litigants whose claims are amenable to immediate resolution. As discussed below, a court applies the same legal standard as that applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)—and similar to those motions, is entitled to rely upon documents attached to or incorporated by reference in a complaint; and documents attached to and incorporated by reference in an answer.

Here, RealNetworks has—through multiple amendments to its answer—added documentary support for its defenses. In this regard, on November 5, 2012, RealNetworks filed a First Amended Answer.

(ECF no. 31 (the "FAA").) Two weeks later, on November 19, 2012, it moved file a second amended answer. (ECF no. 36.) On January 10, 2013, the Court granted that motion. (ECF no. 44; *see also* ECF no. 45 (the "SAA").) Only a few days later, on January 14, 2013, RealNetworks moved yet again for leave to file a Third Amended Answer ("TAA"). (ECF no. 47.) As set forth below, the Court grants that motion; the TAA is therefore the operative answer in this matter.

None of RealNetworks's amendments to its answer succeed in rendering ambiguous that which is unambiguous: RealNetworks agreed to pay VoiceAge royalties for downloads of a software application that used AMR–WB technology. Accordingly, as set forth below, RealNetworks's motion to file an amended answer is GRANTED, and VoiceAge's motion for judgment on the pleadings is also GRANTED in part. On the basis of the pleadings, while liability is clear, the amount of damages owed is not. Further development of the factual record on that issue is necessary.

## BACKGROUND

On December 20, 2010, VoiceAge and RealNetworks entered into a licensing agreement entitled the "AMR–WIDE-BAND STANDARD PATENT LICENSE" (the "Agreement" or the "AMR–WB Agreement"). (*See* ECF no. 19–1.) The "WHEREAS" clauses in the Agreement state that several companies, defined as "Licensors," have appointed VoiceAge to act as licensing administrator and to license rights to their essential patents to the AMR–WB Standard in a single license in return for payment of a single royalty. The WHEREAS clauses premise the license on "consideration of the payments made and to be made by Licensee [Real-Networks]." (*Id.* at 3.)

The Agreement defines the AMR–WB Standard as the "mandatory technical specifications within the Adaptive Multi-Rate Wideband Standard technical specifications of 3GPP that are specified in Appendix A, . . ." (*Id.* at 4.) "Essential AMR–WB Patents" are defined as "the claims of Patents that, in the absence of a license, are necessarily and unavoidably infringed (on technical, but not on commercial grounds) by the practice of the AMR–WB Standard." (*Id.*)

"License Fees" are defined as "the amounts calculated pursuant to Appendix C and due and payable by Licensee to the License Administrator [VoiceAge], in accordance with the terms and conditions set out in Section 4 hereof." (*Id.* at 5.)

Section 4 of the Agreement sets forth terms relating to "Payments and Accounting." (*Id.* at 9.) Section 4.1 refers to applicable License Fees set forth in Appendix C "to this Agreement, and in accordance with the terms and conditions set out below in Section 4." The same provision further states:

> All fees due by Licensee under this Agreement are nonrefundable and nonrecoverable. Furthermore, Licensee acknowledges and agrees that the License Fees are only applicable to the Licensed Products and are not indicative of the fees or royalties that are applicable to a license for the Licensed Patents covering other products that comply with the AMR–WB Standard.
> (*Id.*)

Section 4.4.3 sets forth the timing of royalty reports regarding payments due "under Appendix C of this Agreement". It provides that "[t]he first report shall be due within thirty (30) days of the first calendar semester following the Effective Date of this Agreement [December 20, 2010,] and shall include all payments due up to the end of such calendar semester

including all royalties accrued during that period, including all royalties accrued prior to the Effective Date." (*Id.* at 11.)

Appendix C is entitled "License Fees and Wire Transfer Account Information." (*Id.* at 25.) It provides for fees according to certain categories. Category "C" relates to "Downloaded Applications—content applications." The price "per Real-Time Channel" is listed as $0.10 for a decoder, $0.20 for an encoder, and $0.20 for codec. (*Id.* at 26.)

Section 9.11 of the Agreement states that "[n]othing contained in this Agreement shall be construed as conferring by implication, or otherwise upon either party hereunder any other license or other right except the licenses and rights expressly granted hereunder to a Party hereto." (*Id.* at 17.)[1] Section 14.7 states that "[t]his Agreement and its Appendices constitute the entire agreement between the Parties, and supercede all prior written and oral agreements with respect to the subject matter hereof." (*Id.* at 20.)

VoiceAge alleges, and RealNetworks admits, that on or about May 11, 2011, RealNetworks reported to VoiceAge that the volume of RealPlayer downloads distributed by RealNetworks between December 20, 2010, and April 7, 2011, totaled 26,512,-340. (*See* Compl. ¶ 21; TAA ¶ 21.) That same day, VoiceAge issued an invoice to RealNetworks "in the amount of $2,651,234 (26,512,340 × $0.10) for royalties accrued during that time period." (Compl. ¶ 21; TAA ¶ 21.)

In addition to these amounts, VoiceAge also claims RealNetworks owes it $26.44 million for having utilized the AMR–WB patents in its RealPlayer product prior to

the December 20, 2010, effective date of the Agreement. (Compl.¶ 22.) RealNetworks has denied this allegation. (TAA ¶ 22.) RealNetworks had previously provided VoiceAge with a reporting statement for another of its products, the Helix application, distributed prior to the effective date of December 20, 2010. (Compl. ¶ 24; TAA ¶ 24.) RealNetworks paid the royalties due. (Compl. ¶ 24; TAA ¶ 24.)

On or about March 9, 2011, RealNetworks reported to VoiceAge the number of RealPlayer units distributed by RealNetworks containing the AMR–WB patents prior to December 20, 2010 as 264,446,067. (Compl. ¶ 25; TAA ¶ 25.) VoiceAge then sent RealNetworks an invoice for $26,444,606.70 (*i.e.,* 264,446,067 × $0.10). (Compl. ¶ 25; TAA ¶ 25.) In its TAA, RealNetworks claims that its royalty report "erroneously inflated the number of RealPlayer distributions" by including some number that may not have used AMR technology, included downloads outside the territory covered by the Agreement, and overestimated the number of downloads. (TAA ¶ 25; *see also* SAA ¶ 25; FAA ¶ 25.)[2]

On May 23, 2011, RealNetworks sent a letter to VoiceAge in which it stated that it would not be paying the amounts due pre- or post-effective date of the Agreement. (Compl. ¶ 27.) That letter asserted that RealNetworks never intended to pay ten cents per download for the inclusion of a codec that RealNetworks broadly distributes "for free" and that therefore the Agreement was subject to reformation on the grounds of mistake. (*Id.* ¶ 28.)

---

1. Put another way, the AMR–WB Standard license does not confer rights as to the AMR–WB + Standard. *See infra.*

2. RealNetworks's original Answer generally denied VoiceAge's allegations, without specifying that the royalty report erroneously inflated the number of distributions. (*See* Answer ¶ 25.)

Unable to resolve their dispute regarding payment due, VoiceAge sued RealNetworks for breach of the AMR–WB contract. In its defense, RealNetworks has raised the fact that on the same day that the parties entered in the Agreement, they also executed two other patent licensing agreements, relating to: (1) the "AMR–WB Plus Standard" (ECF no. 31–2) ("AMR–WB +"); and (2) the "AMR–Narrowband Standard" (ECF no. 31–1) ("AMR–NB"). (TAA ¶ 50.) According to RealNetworks, "[e]ach license provided RealNetworks with the right to use some, but by no means all, of the patented technology necessary to practice the AMR standards." (*Id.*) RealNetworks also asserts that "months before entering into the December 20, 2010 [agreements], VoiceAge explained to RealNetworks that the payment terms in Appendix C of the AMR–WB License and the payment terms in Appendix C of the AMR–WB + License would apply to the RealPlayer." (*Id.* ¶ 52.) The AMR–WB + License does not require a royalty payment for downloads of "mono decoders." (ECF no. 31–2 at 24.)

According to RealNetworks, "[t]hose representations from VoiceAge reveal the interrelation between the [agreements]." (TAA ¶ 52.) RealNetworks contends that "[n]either party ever intended that Real-Networks would be required to pay 10 cents per download royalty for the Real-Player products distributed to consumers." (*Id.* ¶ 53.) In addition, RealNetworks asserts that internal discussions at VoiceAge acknowledge that "AMR–WB + can decode the AMR–WB." (*Id.* ¶ 65.) In its opposition to RealNetworks's motion for leave to file its TAA, VoiceAge notes that it is uncontroverted that AMR–WB + is "backwards compatible," but argues that that fact is irrelevant to this dispute. (ECF no. 49 at 2.) VoiceAge points out that RealPlayer did not in fact include the AMR–WB + technology; therefore,

whether it could have included that technology is irrelevant. (*Id.* at 7.) Indeed, in its TAA, RealNetworks does not allege that the RealPlayers it distributed in fact contained the AMR–WB + technology. The point, rather, appears to be that the RealPlayers *could have* contained the technology—and if they had, no royalties would be due. This, evidently, is a point directed at notions of fairness rather than what actually occurred.

## DISCUSSION

### *Leave to File Amended Answer*

Faced with VoiceAge's motion for judgment on the pleadings, RealNetworks seeks now to file a *third* amended answer.

■ Federal Rule of Civil Procedure 15(a)(2) provides that a court should freely allow leave to amend when justice so requires. Fed.R.Civ.P. 15(a)(2). The Second Circuit has instructed that the standard for leave to amend pleadings is permissive-consistent with a strong preference for resolving disputes on the merits. *See Williams v. Citigroup Inc.,* 659 F.3d 208, 212–13 (2d Cir.2011). Leave to amend may be denied if amendment would be futile or result in prejudice or delay. *See McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007); *Schoolcraft v. City of New York,* 10 Civ. 6005, 2012 WL 3960118, at *3 (S.D.N.Y. Sept. 10, 2012). This Court has already, of course, freely allowed a prior amendment—and yet another was as of right—hence, this action is now on its *third* amended answer. This is hardly what the permissive rule of 15(a)(2) contemplated (but the result of a motion for judgment on the pleadings).

■ RealNetworks asserts that the third amendment of its answer adds materials not previously available—to wit,

VoiceAge internal emails asking whether the AMR–WB+ codec was "backwards compatible with the AMR–WB codec." (TAA ¶ 62.) According to RealNetworks, this resulted in an individual at VoiceAge sending an internal email asking "[i]f [RealNetworks] were to put the AMR–WB+ in the RealPlayer would it be able to play back the AMR–WB content?" (*Id.*) A VoiceAge Vice President of Research and Development, Redwan Salami, stated in another email that "if you want to operate with AMR–WB, then if AMR–WB+ is to produce the AMR–WB modes, [ ] it should store the file in AMR 3gp format and not AMR–WB+ format." (*Id.* ¶ 63.) According to the TAA, Salami then made statements regarding his interpretation of the payment terms that might apply. (*Id.*)

None of these allegations change the unambiguous terms of the AMR–WB Agreement entered into between RealNetworks and VoiceAge. Ambiguity cannot be created by words of an employee regarding his personal ex-post facto interpretation of clear contractual language. In addition, references to whether AMR–WB+ could be used to create an end run around the AMR–WB Standard requiring payment of royalties is irrelevant to what has already occurred. RealNetworks does not assert that pre-Effective Date RealPlayer downloads did not incorporate the AMR–WB technology—and that is all that is at issue in this lawsuit.

Accordingly, the Court does not find that RealNetwork's TAA changes its position with regard to its liability for breach of contract. But nor does it delay resolution of this matter or prejudice VoiceAge. Accordingly, the Court grants RealNetworks's motion for leave to file its amended pleading.

### Motion for Judgment on the Pleadings

#### Legal Standard

█ Federal Rule of Civil Procedure 12(c) "provides that 'a party may move for judgment on the pleadings' anytime '[a]fter the pleadings are closed—but early enough not to delay trial.'" *In re Vivendi Universal, S.A., Sec. Litig.*, 842 F.Supp.2d 522, 526 (S.D.N.Y.2012) (quoting Fed. R.Civ.P. 12(c)). "In deciding a Rule 12(c) motion, the Court applies the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true, and drawing all reasonable inferences in favor of the nonmoving party." *Id.* (alterations omitted) (quoting *D'Alessio v. N.Y. Stock Exch.*, 258 F.3d 93, 99 (2d Cir.2001); *see also Quality Serv. Grp. v. LJMJR Corp.*, 831 F.Supp.2d 705, 709 (S.D.N.Y.2011) (same, in context of plaintiffs Rule 12(c) motion)).

█ "Judgment on the pleadings 'is appropriate where material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings.'" *VCG Special Opportunities Master Fund Ltd. v. Citibank, N.A.*, 594 F.Supp.2d 334, 339 (S.D.N.Y.2008) (quoting *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir.1988)). Judgment pursuant to Rule 12(c) can be particularly appropriate in breach of contract cases involving legal interpretations of the obligations of the parties. See *e.g., Goodman v. Port Auth. of N.Y. and N.J.*, 850 F.Supp.2d 363, 389 (S.D.N.Y.2012); *American Commercial Lines. LLC v. Water Quality Ins. Syndicate*, 09 Civ. 7957, 2010 WL 1379763, at *2–3 (S.D.N.Y. Mar. 29, 2010); *VCG Special Opportunities.* 594 F.Supp.2d at 339. The initial interpretation of a contract is a question of law for a court. *Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London*, 136 F.3d 82, 86

(2d Cir.1998). "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002).

### The AMR–WB Agreement

█ The terms of the contract at issue are unambiguous: for every download of a content application using AMR–WB patents, royalties are required. (*See* Agreement, § 4.4.3, Appendix C at 2.)

The Agreement specifically anticipates payment of royalties for use of AMR–WB patents at the outset, including in WHEREAS clause 6 ("to pay a single royalty") and in the NOW THEREFORE provision ("in consideration of payments made and to be made …"). Section 4 of the Agreement sets forth specific provisions for royalty payments. Section 4.1 provides that royalties are payable and "not indicative of the fees or royalties that are applicable to a license for the Licensed Patents covering other products that comply with the AMR–WB Standard." (ECF no. 19–1, at 9.) Section 4.4 requires both reporting and payment. (*Id.* at 11 ("The first report … shall include all payments due … including all royalties accrued prior to the Effective Date. Upon receipt of royalties accrued prior to the Effective Date, the license grant shall be extended to include such Licensed Products Sold prior to the Effective Date.").) Moreover, to eliminate any doubt that the Agreement is intended to create independent obligations, it contains an integration clause. (*Id.* at 20 ("This Agreement and its Appendices constitute the entire agreement between the Parties, and supercedes all prior written and oral agreements with respect to the subject matter hereof.").)

RealNetworks defends against non-payment by urging that "conflicting terms between the AMR–WB License and the AMR–WB + License require the Court to examine extrinsic evidence to determine whether RealNetworks owes VoiceAge anything under the License Agreements." TAA Affirmative Defense 1. The Court disagrees. The language of the AMR–WB Agreement is clear: if the AMR–WB patents are used, then payments must be reported and made. That another license agreement (or two) was (or were) entered on the same day does not require as a matter of law that this Court construe the two (or three) agreements together, looking for ambiguity where otherwise none would exist.

While there are cases in which merger clauses may be overcome when agreements are signed contemporaneously, by the same parties, for the same purpose, *see e.g. Morrissey v. Nextel Partners, Inc.*, 22 Misc.3d 1124(A), 880 N.Y.S.2d 874 (Table), 2009 WL 400030 (N.Y.Sup.Ct.2009), that case law is intended to *promote* the intent of the parties, not *undermine* it. *Id.* at *7. In *Morrissey*, the court found that the definition for a term undefined in one agreement ("bonus minutes") could be pulled from another agreement signed the same day between the same parties, and that that definition was found to be consistent with the overall intent of the parties. *See id.* In addition, in that case the court found that the agreement containing the undefined term was ambiguous—and that it therefore would need to examine parol evidence in any event. *Id.* at *8.

Similarly, in *Commander Oil Corp. v. Advance Food Service Equipment*, 991 F.2d 49 (2d Cir.1993), the Second Circuit found that an asset purchase and lease agreement were intertwined and therefore needed to be read together. *Id.* at 53. In that case, the purchase agreement related to assets which were to be used on the premises referred to in the contemporane-

ously executed lease agreement. Unsurprisingly, the court found that the two agreements were part of a single business transaction. In this regard, the court noted that each agreement had provisions referring to the other. *Id.* The court also found that the language at issue in the litigation before it was susceptible of more than one meaning when in conjunction with the other agreement, and, more importantly, also when read alone. *Id.* at 55. These cases confirm the well-settled rule that the Court should not consider any extrinsic evidence in interpreting an unambiguous contract, and only consider such evidence when contract language standing alone creates an ambiguity. *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 397 (2d Cir.2009); *see Frank v. Reassure Life Ins. Co.,* 12 Civ. 2253, 2013 WL 541426, at *4 n. 3 (S.D.N.Y. Feb. 11, 2013); *Price v. Cushman & Wakefield, Inc.,* 808 F.Supp.2d 670, 703–04 (S.D.N.Y.2011) (rejecting argument to read contracts together to interpret terms when each was unambiguous).

In contrast, the Agreement before this Court is—on its face—unambiguous regarding the technology covered (AMR–WB) and payment due. The fact that another agreement executed on the same date relating to another technology (AMR–WB+) did not require payment, does not render the payment terms in the Agreement at issue ambiguous. RealNetworks's Second Affirmative Defense—that the Agreement is unenforceable on the basis of ambiguity therefore similarly fails.

■ RealNetworks also defends itself on the basis that the Agreement is unenforceable for lack of consideration. But sufficient consideration is recited (the desire for a single license from all of the licensors relating to AMR–WB patents, for a single payment—*e.g.,* the fees contained in Appendix C). Moreover, payment for a license is classic, and real, consideration.

■ RealNetworks defenses of mistake, fraudulent inducement and/or misrepresentation fare no better. The Agreement is clear as to the technology being licensed and the payments due. The merger integration clause is standard. That RealNetworks's obligations ended up being greater than it had anticipated does not eliminate that it freely entered into the bargain it did.[3] The classic contractual mistake is that of a purchaser intending to buy a milking cow and getting a steer or a bull—a version of the animal that could not produce milk. A mistake allowing for reformation must be a mutual mistake of fact, and not a mistake as to the legal consequences of the bargain struck. *See Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.,* 607 F.Supp.2d 600, 603–04 (S.D.N.Y.2009) (collecting cases).

Here, RealNetworks received that for which it bargained—a license for AMR–WB patents—and it agreed to pay a fee for that license on a per download basis. It may have struck a bad bargain for itself—but no facts support that the

**3.** In addition, despite the extensive facts recited by RealNetworks in its TAA, RealNetworks alleges no facts supporting the elements of fraudulent inducement or misrepresentation. "[T]he elements of an action for fraud," or misrepresentation, "in New York are (1) a misrepresentation of fact; (2) which is false; (3) which is known by the defendant to be false; (4) made by the defendant for the purpose of inducing the plaintiff to rely upon it; (5) the plaintiff's justifiable reliance upon the representation; and (6) injury." *Tovar v. Indiana,* 12 Civ. 6104, 2013 WL 182749, at *7 n. 13 (S.D.N.Y. Jan. 17, 2013) (citing *Shovak v. Long Island Commercial Bank,* 50 A.D.3d 1118, 858 N.Y.S.2d 660, 663 (2d Dep't 2008)). "The elements of fraudulent inducement are substantially the same as those for common law fraud." *Sawabeh Info. Servs. Co. v. Brody,* 832 F.Supp.2d 280, 297–98 (S.D.N.Y. 2011).

Agreement reflects a "legal" mistake. *See id.; see also Fantozzi v. Axsys Techs., Inc.*, 07 Civ. 2667, 2008 WL 4866054, at *11 (S.D.N.Y. Nov. 6, 2008) ("It was a choice (not a mistake) [to execute the contract the plaintiffs executed]. Equity will not relieve a party of its obligations under a contract merely because subsequently ... it appears to have been a bad bargain.") (quotation marks omitted); *Beecher v. Able*, 441 F.Supp. 426, 429 (S.D.N.Y. 1977) ("If Douglas' poor prediction were the type of 'mistake' that could serve as the basis for reformation or rescission, then there would be no such thing as a 'bad deal.'"); *U.S. v. Hoffman*, 219 F.Supp. 895, 905 (E.D.N.Y.1963) (Plaintiff "ventured and lost. His bargain was bad. However, the law provides no remedy for bad bargains willingly risked with wide-open eyes.").

Finally, RealNetworks asserts an affirmative defense of substantive unconscionability. Such a defense is unavailing here. Substantive unconscionability may be found only when a contract "is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms." *Ragone v. Atlantic Video at Manhattan Center*, 07 Civ. 6084, 2008 WL 4058480, at *4 (S.D.N.Y. Aug. 29, 2008) (quoting *Sablosky v. Edward S. Gordon Co., Inc.*, 73 N.Y.2d 133, 538 N.Y.S.2d 513, 535 N.E.2d 643, 647 (1989)). Here, again, a bad bargain, even a terrible bargain, is not *ipso facto* substantively unconscionable. If that were so, companies would be incentivized to hire incompetent deal makers and fire those highly skilled; the law does not require or support such perverse teaching.

Accordingly, the Agreement unambiguously requires that RealNetworks pay royalties to VoiceAge for downloads incorporating the AMR–WB patents prior to the Effective Date of December 20, 2010. The pleadings do not, however, allow the Court to enter judgment in a sum certain. In its answer, RealNetworks states that the number of downloads that were in the report it provided to VoiceAge for pre-Effective Date downloads was erroneous. The parties must develop a factual record sufficient for a fact finder to determine the number of downloads for which royalties are due and owing.

## CONCLUSION

As set forth above, defendant's motion for leave to file a Third Amended Answer is GRANTED; plaintiffs motion for judgment on the pleadings is GRANTED in part and denied in part.

The parties shall submit a joint letter by **March 15, 2013, at 5:00 p.m.,** setting forth their positions regarding the nature and amount of discovery necessary to determine damages and a proposed schedule to accomplish the same.

The Clerk of the Court is directed to close the motions at ECF nos. **29** and **47.**

SO ORDERED.

