■ BDC Finance L.L.C., Appellant-Respondent/Counterclaim Defendant, v Barclays Bank PLC, Respondent-Appellant/Counterclaim Plaintiff-Respondent-Appellant. [974 NYS2d 39]—

Order, Supreme Court, New York County (Eileen Bransten, J.), entered August 15, 2012, which, to the extent appealed from as limited by the briefs, denied plaintiff's motion for summary judgment on liability on its breach of contract claim, granted in part defendant's motion for summary judgment dismissing that claim, and denied defendant's motion as to its breach of contract counterclaims, modified, on the law, to grant plaintiff's motion, to deny defendant's motion, and otherwise affirmed, without costs.

On May 5, 2005, plaintiff BDC Finance LLC and defendant Barclays Bank PLC entered into a total return swap, a derivative transaction whereby BDC would obtain the benefits, and assume the risk, of an investment in a portfolio of corporate debt instruments in exchange for paying financing fees to Barclays, which owned the loans. The agreement was memorial-

ized in a series of documents, including a standard form Master Agreement, a standard form Credit Support Annex (CSA), and a negotiated Master Confirmation that modified certain provisions of the standard forms.

Under the agreements, each party had the right to demand collateral from the other party based on changes in the value of the underlying debt instruments. If more collateral was needed, Barclays could make a collateral call for BDC to transfer an amount known as the "Delivery Amount." Conversely, if collateral needed to be returned, BDC could make a collateral call for Barclays to transfer an amount called the "Return Amount." Thus, if BDC determined that Barclays was over-collateralized, then BDC could demand the return of any excess collateral.

At issue in this case is Barclays' alleged failure to meet a $40 million collateral call made by BDC. Barclays maintains that the agreements permitted it to dispute BDC's collateral call by notifying BDC and making a partial payment of what Barclays considered to be the undisputed amount. In support, Barclays points to paragraph 3 (b) of the CSA, which provides that "[s]ubject to Paragraphs 4 and 5, upon a demand made by [BDC] . . . . [Barclays] will Transfer to [BDC] [the amount of collateral] specified by [BDC] in that demand" (i.e., the Return Amount). Paragraph 4 (b) provides that if the demand is made by 1:00 p.m., the transfer of collateral must be made by the end of the following business day, but if the demand is made after 1:00 p.m., the transfer must be made by the end of the second business day.

According to Barclays, paragraph 5 of the CSA sets forth a mechanism for resolving disputes over the proper amount of the collateral calls. Under that provision, the disputing party is required to both notify the other party of the dispute and transfer the undisputed amount by the end of the business day following the date of the demand. The parties are then required to consult with each other in an attempt to resolve the dispute, and if that fails, they must utilize the CSA's formal dispute resolution process.

BDC maintains that the dispute procedures contained in paragraph 5 of the standard form CSA were expressly modified by the Master Confirmation that was negotiated by the parties. The Master Confirmation contains a "Delivery of Collateral" clause that provides that "[n]otwithstanding anything in the [CSA] to the contrary . . . [Barclays] shall Transfer any Return Amounts . . . not later than the Business Day following the Business Day on which [BDC] requests the Transfer of such Return Amount." Unlike the form CSA, this clause requires

that any transfer take place by the business day following the demand, regardless of whether the demand was made before or after 1:00 p.m. According to BDC, the Delivery of Collateral clause also nullifies the CSA's dispute resolution procedures and requires transfer of the entire Return Amount pending resolution of a dispute, and not just the undisputed amount. In other words, BDC maintains that if Barclays disagreed with the Return Amount demanded, it was required to pay first, and dispute later. Barclays, on the other hand, contends that the Delivery of Collateral clause modified only the timing of the transfer and left intact the dispute resolution process.

As relevant here, an Event of Default occurs when a party fails to perform any obligation required under the CSA if such failure is continuing after any applicable grace period has elapsed (Master Agreement § 5 [a] [iii] [1]). The CSA states that an Event of Default exists if a party fails to transfer required collateral and such failure continues for two business days after notice of that failure is given (CSA ¶ 7 [i]). If an Event of Default occurs, the non-defaulting party may, upon proper notice to the defaulting party, designate a Early Termination Date for all outstanding transactions (Master Agreement § 6 [a]).

On October 6, 2008, BDC determined that Barclays was overcollateralized, and demanded, pursuant to paragraph 3 (b) of the CSA, that Barclays transfer a $40,140,405.78 Return Amount. Barclays made no payment that day, believing that it owed BDC only $5,080,000 in excess collateral (the undisputed amount). The next day, October 7, 2008, having received no payment by mid-afternoon, BDC again wrote to Barclays asking that it remit the $40 million Return Amount. Barclays, however, did not transfer the $40 million Return Amount by the deadline. Nor did Barclays transfer the $5,080,000 undisputed amount. In fact, Barclays made no payment on October 7, 2008.

The following day, October 8, 2008, Barclays sent BDC a flat $5 million payment, which was a day late and $80,000 less than the undisputed amount. That same day, BDC sent Barclays a "Notice of Failure to Transfer Return Amount" (the default notice). In the default notice, BDC informed Barclays that it had been required, by October 7, 2008, to either pay the $40 million Return Amount or the undisputed amount. The notice declared a Potential Event of Default against Barclays, and advised Barclays that if it failed to cure within two business days, it would be in default under section 5 (a) (iii) (1) of the Master Agreement and paragraph 7 (i) of the CSA. Despite this notice, Barclays did not cure by remitting the balance of the $40 million Return Amount.

On October 13, 2008, BDC sent Barclays a notice declaring Barclays in default for having failed to transfer the $40 million Return Amount within the cure period (the termination notice). The termination notice advised Barclays that the default was continuing, and designated the following day as the Early Termination Date ending all transactions pursuant to section 6 (a) of the Master Agreement. The termination of the agreements obligated Barclays to return BDC's collateral that it was holding, which, according to BDC, amounted to approximately $297 million. On October 17, 2008, BDC requested Barclays to remit this amount, but Barclays never did. This litigation ensued.

BDC's default notice stated that in order to have properly disputed the collateral call, Barclays was required to have both notified BDC of the dispute and transferred the undisputed amount of $5,080,000 by October 7, 2008. The evidence in the record establishes as a matter of law that Barclays did not do this. Barclays' payment of $5 million on October 8, 2008 was a day late. Accordingly, BDC notified Barclays that it had two business days to pay the Return Amount. Still, Barclays did not remit the $40 million, placing it in default. Barclays' default, in turn, entitled BDC to terminate the transactions and demand return of its collateral.[1] Because Barclays did not return BDC's collateral, it breached the agreements, and summary judgment on liability should have been granted to BDC.[2]

Barclays unpersuasively argues that its $5 million payment within the two-day period cured any default. Having failed to timely pay the undisputed amount by the deadline, Barclays lost any right it may have had to suspend payment of the full $40 million. Under paragraph 7 (i) of the CSA, a default occurs when a party fails to make a required transfer of collateral, and that failure continues for two business days after notice. In BDC's default notice, Barclays' specific failure was identified in the caption: "Notice of Failure to Transfer Return Amount." The default notice specified that Barclays would be in default if "this failure"—i.e., the failure to pay the $40 million— continued for two business days. Thus, to effect a cure, Barclays was required to transfer the full $40 million Return Amount, not simply the undisputed amount.

---

1. At the time of the termination notice, Barclays still had not paid the $40 million, thus making its default "continuing" under section 6 (a) of the Master Agreement.

2. The motion court properly concluded that BDC could not terminate based on Barclays' alleged improper valuation of its own post-September 15 collateral calls. BDC failed to provide Barclays with the requisite notice and opportunity to cure this alleged breach.

There is no merit to the dissent's contention that the language in BDC's default notice allowed Barclays to pay either the full Return Amount or the undisputed amount within the cure period. The dissent gives no weight to the heading section of the notice, which plainly identifies the default as "Failure to Transfer Return Amount." The heading does not advise Barclays of its failure to remit the undisputed amount because by the time the notice was sent, that option was no longer available.

Moreover, it makes little sense, as the dissent suggests, for Barclays to have been given an additional two days to pay the undisputed amount. The dispute resolution procedures in the CSA set forth a very strict and tight deadline requiring Barclays, in the event of a dispute, to transfer the undisputed amount within one business day of the demand, i.e., by October 7, 2008. BDC's default notice advised Barclays that it failed to meet that deadline and thus was in default on the $40 million collateral call. Barclays' only option at that point was to remit the full Return Amount, which it failed to do.

The dissent's view of the options available to Barclays during the cure period turns on the belief that the agreements permitted Barclays to dispute the Return Amount before paying it in full. We disagree. The plain and unambiguous language of the Delivery of Collateral clause requires Barclays to transfer any Return Amount demanded by BDC no later than the business day following the demand. This obligation is unconditional and absolute and exists "[n]otwithstanding anything in the [CSA] to the contrary." Thus, the Delivery of Collateral clause expressly supercedes the form language in the CSA which would have otherwise permitted Barclays to dispute before paying (see H. Fox & Co., Inc. v Blumenfeld, 24 AD3d 722, 722-723 [2d Dept 2005] [contractual provision that applied "(n)otwithstanding anything to the contrary set forth in this lease" was unambiguous and controlled over any other lease provision]). Likewise, the dissent's conclusion that the Delivery of Collateral clause only modifies the transfer timing provisions of the CSA finds no support in the language of the agreements. Although BDC may have been willing to allow Barclays to pay the undisputed amount if it did so by the close of business on October 7, once that deadline passed, it was entitled to call an event of default based on the wording of the Master Confirmation (see e.g. Triax Capital Advisors, LLC v Rutter, 83 AD3d 490 [1st Dept 2011], appeal dismissed 17 NY3d 804 [2011] [emails between the parties cannot be used to create an ambiguity in an otherwise clear agreement]).

We recognize that the Delivery of Collateral provision is unilateral and requires Barclays, and not BDC, to pay first and dispute later. We disagree, however, with the dissent's conclusion that this results in a harshly uneven allocation of economic power requiring this Court to, in effect, rewrite the parties' contact (*see Jade Realty LLC v Citigroup Commercial Mtge. Trust 2005-EMG*, 83 AD3d 567, 568 [2011], *affd* 20 NY3d 881 [2012] ["The fact that contractual terms are novel or unconventional does not bring them or the contract in question to the level of absurdity" (internal quotation marks omitted)]). The CSA still required BDC to calculate the Return Amount in a commercially reasonable manner and in good faith (CSA ¶ 11 [d]). Furthermore, if Barclays disagreed with the Return Amount, it could have paid it and then made its own collateral call the next business day (CSA ¶ 3 [a]). And if Barclays wanted to dispute the Return Amount, it still could have done so provided that, as the agreements required, Barclays paid the full Return Amount while the dispute was pending. Since the Delivery of Collateral clause is contained in an agreement negotiated by two sophisticated commercial entities, the court should not, in the guise of contractual interpretation, alter the plain language of the clause (*see Jade Realty LLC*, 83 AD3d at 568).

There is no merit to the dissent's suggestion that there is an issue of fact as to whether there was an undisputed amount owed by Barclays after BDC issued its $40 million collateral call. Although there may have initially been some confusion about the amount in dispute, Barclays ultimately concluded that it owed BDC $5,080,000.[3] More importantly, in its response to BDC's Requests for Admission, Barclays made a formal judicial admission that "$5,080,000 was the undisputed amount . . . of BDC's October 6, 2008 collateral call." Contrary to the dissent's position, Barclays does not contest in this litigation that there was an undisputed amount owed to BDC. In fact, Barclays' appellate brief repeatedly refers to its $5 million payment as "the undisputed amount."

The dissent also maintains that issues of fact exist as to whether Barclays' communications with BDC constituted timely notice of a dispute under the CSA. Even if that were true, BDC would still prevail. As noted earlier, the dispute resolution procedures required Barclays to not only provide notice of the dispute by October 7, 2008, but to also transfer the undisputed

---

3. Although the dissent states that Barclays did not make this determination until the late afternoon of October 7, the record reflects that Barclays acknowledged that it owed $5,080,000 on the morning of October 7.

amount by that date. The evidence in the record undeniably shows that Barclays failed to pay the undisputed amount by the deadline, and establishes as a matter of law that Barclays did not comply with the CSA's dispute resolution procedures.

Barclays is not entitled to summary judgment on its counterclaims alleging that BDC failed to meet Barclays' collateral calls made on October 10 and 14, 2008. BDC was not required to meet those calls because at the time they were due, Barclays was already in default and BDC had terminated the transactions (see CSA ¶ 4 [a]). Concur—Saxe, DeGrasse and Richter, JJ.

Andrias, J.P., and Gische, J., dissent in part in a memorandum by Andrias, J.P., as follows: In this dispute arising out of a Total Return Swap agreement between hedge fund BDC and Barclays Bank, each party asserts that it was entitled to terminate the agreement based on the other's alleged default in transferring collateral. The motion court denied BDC's motion for summary judgment on its breach of contract and declaratory judgment claims, granted Barclays' motion for summary judgment to the extent of dismissing that portion of BDC's breach of contract claim alleging that Barclays was required to pay the full amount of BDC's October 6, 2008 collateral call prior to disputing it, and denied Barclays' motion for summary judgment as to its counterclaims.

The majority would modify to grant BDC summary judgment, based on BDC's argument that even if Barclays was entitled to dispute BDC's October 6, 2008 collateral call before paying it, Barclays did not follow the dispute mechanism set forth in the parties' agreement. Because I believe that issues of fact exist in this regard, I respectfully dissent.

The agreement consists of a Master Agreement, a Schedule and a Credit Support Annex (CSA), all on ISDA forms, and a Master Confirmation drafted by the parties. The CSA allowed BDC to request a "Return Amount" of what it calculated to be excess collateral based on changes in the value of the Reference Assets (debt instruments). The CSA's "Transfer Timing" provision stated that the transfer of the Return Amount would be made by (i) the end of the next business day following a request made no later than the Notification Time (1:00 p.m.) or (ii) the end of the second business day following a request made after the Notification Time. In contrast, the "Delivery of Collateral" provision of the Master Confirmation Agreement provided that notwithstanding anything in the CSA to the contrary, Barclays "shall Transfer any Return Amounts in respect of Transactions not later than the Business Day following the Business Day on which" BDC requested it.

The CSA suspended Barclays' obligation to transfer a Return Amount following, among other things, notice of a dispute under the contractual procedure for resolving disputes over collateral calls. This included a two-step dispute resolution mechanism: (1) informal, under which the disputing party had to notify the other party of the dispute and transfer the undisputed amount to the other party, and the parties would attempt to resolve the dispute between themselves, and (2) formal, which required the party who made the collateral call to recalculate by seeking four quotations at mid-market from Reference Market makers, and use their average to determine the Reference Assets value.

Preliminarily, I believe that the motion court correctly found that Barclays was not required to pay the full amount of BDC's $40 million collateral call prior to disputing it. "An interpretation that gives effect to all the terms of an agreement is preferable to one that ignores terms or accords them an unreasonable interpretation" (*Ruttenberg v Davidge Data Sys. Corp.*, 215 AD2d 191, 196 [1st Dept 1995]). Applying this principle, the delivery of collateral provision in the parties' Master Confirmation Agreement should be read as modifying only the Transfer Timing provision of the CSA. Under this interpretation, the Master Confirmation Agreement does not modify any portion of CSA's dispute resolution or conditions precedent provisions, which remain in full force and effect.

BDC's reading of the agreements forces Barclays, not BDC, to pay first, then dispute any collateral call. The "court will endeavor to give the [contract] [the] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other" (*Metropolitan Life Ins. Co. v Noble Lowndes Intl.*, 84 NY2d 430, 438 [1994] [internal quotation marks omitted]). This is because "[i]t is highly unlikely that two sophisticated business entities, each represented by counsel, would have agreed to such a harshly uneven allocation of economic power under the Agreement" (*id.*). As both parties were allowed to act as valuation agents with respect to collateral, it is illogical that the agreements would require only one party to pay first and dispute later. Reading the agreements as a whole so as to achieve the purpose of the parties, and giving all of the agreements' provisions full force and effect, the motion court properly rejected BDC's reading of the agreements as requiring Barclays to have paid the full amount of BDC's October 6th collateral call prior to disputing a portion of it.

The majority disagrees, stating that the plain and unambiguous language of the Delivery of Collateral clause required

Barclays to transfer any Return Amount demanded by BDC no later than the business day following the demand. However, this interpretation is belied by BDC's own conduct prior to the litigation. During the afternoon of October 7, 2008, BDC advised Barclays by email that "[a]t present, we have not received payment, nor has Barclay's exercised its dispute right. We remind you that pursuant to paragraph 4 (b) and Paragraph 5 of the [CSA], by 5:00 p.m. today Barclays must *either* pay the amount set out in the request *or* exercise its dispute rights" (emphasis added). Consistent with this interpretation, in the "Notice of Failure to Transfer Return Amount" it sent to Barclays on October 8, 2007, BDC again stated that "[p]ursuant to Paragraph 4 (b) and Paragraph (5) of the CSA, by 5:00 p.m. NY time on Tuesday, October 7, 2008, Barclays was required to *either* (i) pay the relevant Return Amount or (ii) notify BDC that Barclay's disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount" (emphasis added). Thus, BDC unequivocally advised Barclays that it had the right to pay or dispute and, at a minimum, BDC is bound by this interpretation of the contract with respect to its October 6th collateral call.

The majority finds that even if Barclays was entitled to pay or dispute, Barclays defaulted because it failed to tender either the full amount of BDC's $40 million collateral call of October 6, 2008, or invoke the parties' dispute mechanism by timely submitting the "undisputed amount" of $5,080,000 in full by October 7, 2008. The majority also finds that when BDC sent Barclays a "Notice of Failure to Transfer Return Amount" on October 8th, Barclays could only cure by remitting the full $40 million return amount within two days of the notice. The majority reasons that "[h]aving failed to timely pay the undisputed amount by the deadline, Barclays lost any right it may have had to suspend payment of the full $40 million." I disagree and believe that the motion court correctly found issues of fact whether Barclays intended its communications with BDC following BDC's October 6th collateral call to be a notice of dispute under the CSA, whether they imparted sufficient notice to BDC, and whether BDC complied with the informal dispute mechanism.

On October 6th, Barclays sent BDC a collateral call for the Return Amount of $11.75 million. Hours later, BDC sent Barclays a collateral call for the Return Amount of $40 million. BDC's demand arose out of a dispute over Barclays' methodology in calculating its own collateral calls. After the Lehman Brothers' bankruptcy, Barclays changed its valuation method

because it believed the value of the underlying assets was falling faster than the previously used LoanX prices reflected. BDC claims this inflated Barclays' collateral calls, which BDC continued to pay.

Upon receipt of BDC's October 6th collateral call, Barclay's immediately advised BDC that "[w]e do not agree with this call" and asked BDC if it wanted "to invoke the dispute mechanism." BDC responded that it was not seeking to invoke the dispute mechanism, and that it was making its own collateral call for a Return Amount under the CSA, which was independent of any requests for Delivery Amounts made by Barclays, which BDC would continue to address in accordance with the agreement. Barclays responded that "[w]e show that BDC owes Barclays, not the other way around" and employees of the parties agreed later that day that BDC owed Barclays $13.52 million, which BDC paid. Thus, questions of fact exist as to whether there was any undisputed amount owed by Barclays to BDC when Barclays refused to pay the $40 million return amount on October 6, 2008, and whether Barclays' responses that day, considered in light of the past practice of the parties, were sufficient to invoke the informal dispute resolution mechanism agreed to by the parties.

The majority states that Barclays has admitted that $5,080,000 was the undisputed amount of BDC's October 6, 2008 collateral call and that this amount had to be paid by October 7th. However, it was not until October 7th that the parties began discussing whether Barclays was holding more collateral than it had asked for, and it was not until 4:05 p.m. that day that an employee of Barclays, after accounting for the payments that Barclays received from BDC on October 6th, advised BDC that "Barclays agrees to return 5,080,000. This is for margin call made on 10/6." Thus, as BDC's expert reported, "[i]t appears that BDC understood that the $5.08 million reflected excess collateral based on Barclays' own valuations, not BDC's," and was not based on BDC's $40 million demand. Specifically, Barclay's demanded $11.75 million from BDC on October 6th and BDC made payments that day of $3.1 million and $13.52 million for a total of $16.53 million, resulting in an overpayment of $5.08 million. Consistent with this, the Judicial Admission on which the dissent relies, states in full: "Barclays denies Request No. 38, except admits that *after receiving BDC wire transfers on October 6, 2008*, Barclays concluded that $5,080,000 was the undisputed amount, as that term is used in the Credit Support Annex, of BDC's October 6, 2008 collateral call" (emphasis added). Barclays has disputed in this litigation

that it owes any part of the $40 million demanded by BDC on October 6th, which was based on Barclays' change in its valuation methods.

The next day, October 8th, Barclays transferred $5 million to BDC. Barclays asserts that the $80,000 balance was then deducted from its own collateral calls to BDC. Particularly, after making the $5 million payment, Barclays sent BDC a collateral call stating "[a]s of COB Oct 7, 2008 Barclays Bank PLC are calling for . . . $20,500,000 for value Oct 8, 2008." After receiving a $7.25 million transfer from BDC on the morning of October 9th, Barclays reduced its collateral call from $20.5 million to $13.25 million, which BDC paid that afternoon. Barclays maintains that the amount of its collateral calls would have been $80,000 greater if Barclays had returned $5,080,000 the day before instead of $5 million. The ISDA Master Agreement does contemplate "netting," stating that whenever amounts would otherwise be payable by each party to the other, in the same currency and with respect to the same transaction, the two amounts shall be set off and only the net amount shall be payable. Thus, a question of fact also exists as to whether Barclays paid the undisputed amount of $5,080,000 in full.

As to the timeliness of the payment, even if it was due on October 7th, on October 8, 2008, BDC sent Barclay's a "Notice of Failure to Transfer Return Amount," stating:

"Pursuant to Paragraph 4 (b) and Paragraph 5 of the CSA, by 5:00 p.m. NY time on Tuesday, October 7, 2008, Barclays was required to either (i) pay the relevant Return Amount or (ii) notify BDC that Barclays disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount. As of 5:00 p.m. NY time on October 7, BDC received neither payment or notice of dispute. Therefore, a Potential Event of Default has occurred under the Master Agreement with respect to Barclays.

"This notice constitutes a 'notice of failure' pursuant to Paragraph 7 (i) of the CSA. Please be advised that if this failure continues for two business days, an Event of Default will have occurred with respect to Barclays under Section 5 (a) (iii) (1) of the Master Agreement."

Paragraph 7.1 refers to the failure to make, when due, a collateral payment "required to be made by [the party]." A failure to make a transfer does not become an Event of Default unless the non-defaulting party gives the allegedly defaulting party notice of a failure to perform and "that failure continues for two Local Business Days after notice of that failure is given to that party."

While the Notice of Failure references Barclays' obligation to "(i) pay the relevant Return Amount or (ii) notify BDC that Barclays disputes the calculation of the Return Amount and make a payment with respect to the undisputed amount," in describing the "Potential Event of Default" it does not address Barclays' alleged shortfall or untimeliness in remitting the undisputed amount of $5,080,000, and Barclays was not notified that it had defaulted in that respect. Rather, the notice states that "BDC received neither payment or notice of dispute." As set forth above, the $5,080,000 figure was based on BDC's overpayment of Barclays' October 6th collateral calls, and an issues of fact exists as to whether Barclays provided BDC with adequate notice that it disputed BDC's October 6, 2008 collateral call seeking the $40 million. Even if the "Potential Event of Default" is viewed as Barclays' failure pay the Return Amount or notify BDC that it disputed the collateral and pay the undisputed amount, the notice gave Barclays two days to cure this failure and did not state that this could only be accomplished by paying the full Return Amount. Thus, even if Barclays was in default, contrary to the majority's view, Barclays could cure by either paying the Return Amount or the undisputed amount. In holding otherwise, the majority focuses on the heading section of the notice, which reads "Notice of Failure to Transfer Return Amount." However, I do not believe that the heading can be used to override the express language used therein.

Insofar as BDC claims it was entitled to declare an early termination of the agreements based on Barclays' improper valuations of its own collateral calls, if BDC received a collateral call with which it disagreed, its only alternatives under the agreements were either (i) to pay Barclays, or (ii) to use the dispute resolution mechanism as mandated by paragraph 5 of the Credit Support Annex. Further, in holding that paragraph 5 gave BDC its exclusive recourse upon receiving an objectionable collateral call, the motion court properly found that the CSA's dispute resolution process was a "mandatory" part of the "agreed upon" contract (see *VCG Special Opportunities Master Fund Ltd. v Citibank, N.A.*, 594 F Supp 2d 334, 343 [SD NY 2008], *affd* 355 Fed Appx 507 [2d Cir 2009]). Accordingly, having failed to follow the CSA's dispute resolution clause, BDC cannot seek to avoid that agreement's requirements and retroactively challenge Barclays' calculation of its post-September 15 collateral calls.

The motion court correctly found that it cannot be determined whether BDC defaulted with respect to the collateral calls made

by Barclays on October 10th and October 14th until it is determined whether Barclays first defaulted with respect to the October 6th collateral call.